**In re WHITE MOTOR CORPORATION, Debtor.**

**EMPLOYEE TRANSFER CORPORATION, Appellant,**

v.

**John T. GRIGSBY, Jr., Disposition Assets Trustee, Appellee.**

**Civ. A. No. C85–349.**

United States District Court, N.D. Ohio, E.D.

May 27, 1986.

Thomas C. Pavlik, Joseph C. Domiano, Sindell, Sindell & Rubenstein, Cleveland, Ohio, for appellant.

Pat E. Morgenstern-Clarren, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, David G. Heiman, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Richard Gurbst, Squire, Sanders & Dempsey, Cleveland, Ohio, for debtor/appellee.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

The question presented in this bankruptcy appeal is whether the bankruptcy court erred in concluding that the claims of Employee Transfer Corporation ("ETC") for post-petition services and expenditures on behalf of White Motor Corporation ("WMC"), pursuant to ETC's pre-petition obligations, were not administrative expenses under Bankruptcy Code Section 503(b)(1)(A). For the reasons set forth below, the judgment of the bankruptcy court is affirmed.

The District Court's appellate jurisdiction rests on 28 U.S.C. § 158,[1] enacted by the

---

1. Title 28 U.S.C. § 158 provides in pertinent part:

Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333.

I.

ETC and WMC entered into a contract on November 11, 1971 ("the First Contract") under which ETC agreed to offer to purchase houses from WMC employees who had been transferred in the course of their employment. On September 4, 1980, WMC filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.* WMC's payment of post-petition expenses relating to houses acquired pre-petition gives rise to this action.

Under the terms of the First Contract, ETC agreed to acquire and resell the residence of any WMC employee who was transferred and who accepted ETC's offer to buy his property. When informed of their transfers, WMC employees were provided with information about ETC's service. WMC then notified ETC if the employee wanted to utilize that service. ETC became obligated upon such notification to commence the process of establishing a fair price for the property and offering to buy it.

Through the offer process, ETC contacted the employee to arrange for an appraisal of the property, ordered two independent appraisals, computed a fair market value and made an offer to buy the employee's residence at that fair market valuation. The employee then had fifteen days within which to accept the offer. If the offer was accepted, ETC paid the employee for his equity in the house and ETC took title.

ETC was thereafter obligated to manage the property and to make payments for maintenance, the mortgage, insurance and utilities. Transcript of Proceedings at 68. ETC was in fact contractually obligated to make the required expenditures, as shown by the testimony of John Clarke, general manager of ETC's Cleveland operations until June of 1982:

Q  Now, for a house, for example, that would be acquired by ETC prior to September 4, what would be the obligation of ETC to perform those services after September 4?

A  They would be continued.

Q  They would continue?

A  Yes.

Q  What was the basis for your statement?

A  Again, we would probably get in gray area here, but I would believe that once we made that obligation to the transferee that we needed to continue that to make sure that the transferee was not financially hurt or was affected by their employer's inability to pay or what have you.

   We sort of run interference for the transferee at that point.

Q  In fact, then, as far as you know, for houses that were acquired by ETC prior to September 4, 1980, did the services that you have been just describing continue on after September 4, 1980?

A  Yes.

Q  Or did they stop?

A  No.

   \*      \*      \*      \*      \*      \*

Q  Now, as far as you know, Mr. Clarke, if WMC had refused to make payment for these services being furnished would ETC be able to stop furnishing them?

   \*      \*      \*      \*      \*      \*

(a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

(c) An appeal under subsection[ ] (a) ... of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

A   If White Motor Corporation elected not to pay?

Q   Yes.

A   Probably not. And the reason is that we still had obligations to not only White Motor Corporation, but its employees. And again, to continue doing business and the type of business, a highly competitive business, you simply couldn't walk away or refuse to do business with somebody.

Again, White Motor at that time indicated they were going to continue on. Transcript of Proceedings at 53–55.

ETC attempted to dispose of the property as quickly as possible. Upon resale, ETC billed WMC for all direct costs, including management and maintenance expenses, and loss on resale, interest and service charges. ETC's primary function, though, was to purchase the property in order to permit the employee to move. Transcript of Proceedings at 44.

Prior to a hearing before the bankruptcy judge on ETC's motion for payment of administrative expenses, the parties entered into the following stipulations:

2. In March 1980, ETC tendered certain changes to the First Contract to WMC.

3. In May 1980, WMC advised ETC that the proposed new changes were unacceptable to WMC.

4. By letter dated May 28, 1980, ETC gave WMC notice that the First Contract would be cancelled effective 60 days from the date on which WMC received said notice.

5. Subsequent to that notice, WMC and ETC undertook efforts to negotiate a new contract or modify the First Contract.

The First Contract expired on or about July 28, 1980. WMC and ETC then began negotiations for a new contract. In the meantime, ETC continued to provide relocation services on an ad hoc basis. ETC's obligations were virtually the same as they had been under the First Contract; when a WMC employee accepted ETC's offer, ETC paid fair value for the property, took title, and was thereafter responsible for maintaining the property and making the required payments.

At 4:49 p.m. on September 4, 1980, WMC filed its petition for reorganization. The bankruptcy court authorized WMC to remain in possession and control of the property of WMC as debtor-in-possession, and to manage and operate its business affairs pursuant to 11 U.S.C. §§ 1107 and 1108. Between July 28, 1980 and September 4, ETC purchased approximately eleven properties on an ad hoc basis. ETC continued to incur and accrue expenses for properties it had purchased pre-petition.

The parties further stipulated that "[o]n or about October 10, 1980, Keith Mazurek, then President of WMC, signed, without bankruptcy court authority, a contract with ETC purportedly effective October 10, 1980 ("the Second Contract").... ETC's position is that Bankruptcy Court authority was not needed."

The Second Contract reaffirmed the working relationship between ETC and WMC. Section (E)(6), however, modified the terms upon which ETC billed WMC:

6. The terms of this Agreement shall be applicable to each transaction initiated by ETC's purchase of employee property subsequent to July 31, 1980; provided, however, that the application of the 20% Fee Payment described in C.1. above shall be limited to those properties purchased by ETC on or after September 4, 1980; and on those properties purchased by ETC subsequent to July 31, 1980 and prior to September 4, 1980 on which no 20% Fee Payment was made, expense incurred on or after September 4, 1980 including interest charged, by ETC, in connection with such properties shall be reimbursed on a monthly basis. All transactions initiated by ETC purchases prior to August 1, 1980, shall continue to be governed by the prior Agreement between the Company and ETC, except that effective September 4, 1980, expense, including interest charged, incurred by ETC in connection with such

properties, shall be reimbursed on a monthly basis.

In essence, section (E)(6) provided that WMC was to continue to reimburse ETC for expenses arising post-petition even for residences purchased by ETC pre-petition.

The parties further stipulated that:

8. The Bankruptcy Court did not ever specifically authorize WMC to enter into the Second Contract and such authority was not sought by any party. ETC's position is that Bankruptcy Court authority was not needed.

9. ETC acquired legal title to most of the parcels purchased by it under both the First Contract and the Second Contract, subject in some cases to the employee's mortgage and certain contractual restrictions. ETC acquired legal title prior to September 4, 1980 for all parcels listed on Exhibit C.

10. ETC entered into contracts relative to each parcel listed on Exhibit C attached hereto prior to September 4, 1980.

11. The total amount expended and/or accrued by ETC prior to September 4, 1980 with respect to the parcels listed on Exhibit C is $573,751.16, exclusive of interest to which ETC purports to be entitled.

12. The total amount expended and/or accrued by ETC after September 4, 1980 with respect to the parcels listed on Exhibit C [and not paid by WMC] is $236,146.38, exclusive of interest to which ETC purports to be entitled.

13. Subsequent to September 4, 1980, WMC paid $843,034.47 to ETC for amounts expended and/or accrued by ETC in connection with the parcels listed on Exhibit C.

14. All amounts due to ETC by WMC under the Second Contract with respect to parcels acquired by ETC after September 4, 1980 has been paid in full. These amounts totaled approximately $800,000, exclusive of unpaid interest to which ETC purports to be entitled.

On May 5, 1981, ETC filed a Proof of Claim, and on November 9, 1982 it filed a motion to pay administrative expenses in the amount of $155,333.79. This motion was amended to seek recovery of $923,930.40 in administrative expenses. The claim was tried to the bankruptcy court on ETC's amended motion. At trial, ETC further amended its claim to seek recovery of $236,146.38 as administrative expenses and $573,751.16 as general unsecured debt. WMC contended that all amounts owed were general unsecured debt and that such debt had to be reduced by the amount incorrectly paid to ETC post-petition.

The bankruptcy court held that: (1) the Second Contract could not effectively convert post-petition payments for pre-petition houses as expenses of administration; (2) post-petition payments expended or accrued by ETC on parcels purchased pre-petition were not administrative expenses; and (3):

> ETC is entitled to a general, unsecured claim for $1,652,932.00 ignoring momentarily WMC's improper payments. The claim consists of the undisputed $573,751.16 for payments accrued pre-petition, $236,146.38 accrued and unpaid post-petition and $843,034.47 accrued and improperly paid post-petition. General, Unsecured Claims represented as Class 2 under WMC's confirmed plan have been paid 43.5%. Projected distributions are estimated at 53%. ETC's receipt of $843,034.47 is 51% payment of its allowed claim. ETC, therefore, is entitled to no additional payment under the plan unless and until other Class 2 claims have been paid 51%.

*In re White Motor Corp.*, No. B80–3361, slip op. at 12–13 (Bankr.N.D. Ohio Dec. 14, 1984).

ETC filed a timely notice of appeal, posing the following question:

> Did the Bankruptcy Court err in concluding that the claim of E.T.C. filed in the within Case, in the amount of $235,146.38 [sic] for post petition payments and the amount of $843,034.47 paid post petition to E.T.C. by White Motors, the Debtor as Debtor-in-Possession, were not

pursuant to Bankruptcy Code Section 503(b)(1)(A), "actual, necessary costs and expenses of preserving" the estate of the Debtor as Debtor-In-Possession, and were therefore not administrative expenses.

Upon examination of the briefs and record, this Court determines that "the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument." Bankruptcy Rule 8012.

## II.

### A.

The parties agree that ETC is a general unsecured creditor with respect to $573,-751.16 expended or accrued prior to the filing date, and that ETC is entitled to administrative priority with respect to expenses for houses it purchased after the filing date. The present controversy concerns expenses incurred or accrued after the filing date with respect to houses purchased by ETC before September 4, 1980.

### B.

ETC contends that all post-petition expenses relating to pre-petition houses are administrative expenses pursuant to 11 U.S.C. § 503(b)(1)(A) and therefore entitled to priority under 11 U.S.C. § 507(a)(1). Section 503(b)(1)(A) provides:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;

Title 11 U.S.C. § 507(a)(1) provides:

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title....

The heart of ETC's analysis begins with the proper statement that a creditor's right to administrative priority is dependent upon whether the "consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976). ETC argues that its post-petition expenses were "actual, necessary costs and expenses of preserving the estate" because WMC's continued operation required relocation services, and because its post-petition services with respect to pre-petition houses conferred various administrative, financial and employee relation benefits upon WMC, the debtor-in-possession.

ETC also contends that 11 U.S.C. § 363(c)(1) compels enforcement of the Second Contract, particularly section (E)(6). Section 363(c)(1) provides:

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

ETC contends that the Second Contract was entered into in the "ordinary course of business" and that the Second Contract is therefore valid and binding upon WMC even though it was never specifically authorized by the bankruptcy court.

Finally, ETC argues that WMC's insolvency constituted an anticipatory breach, that ETC's performance was excused as a result of such breach, and that the bankruptcy court therefore erred in concluding that ETC was obligated to pay expenses for pre-petition houses.

The Trustee claims that ETC's interpretation of the Bankruptcy Code would convert pre-petition obligations into post-petition administrative expenses. Focusing on § 503(b)(1)(A) he asserts that "ETC has the burden of proving (1) that ETC provided

consideration to the [debtor-in-possession] as opposed to the preceding entity; and (2) that the services performed directly and substantially benefited the estate." Brief of Appellee at 6. The Trustee argues that ETC neither provided new consideration to the debtor-in-possession nor conferred specific and substantial benefits upon the debtor-in-possession.

The Trustee further contends that 11 U.S.C. § 363 is irrelevant to the present case. Even if it were relevant, he argues, the Second Contract cannot be in the ordinary course of business where it purports to convert pre-petition obligations into post-petition obligations.

Finally, the Trustee urges that ETC's "intention" to be paid 100 cents on the dollar for pre-petition houses is irrelevant and insufficient "to justify elevating one creditor over other creditors similarly situated." Brief of Appellee at 12.

### III.

#### A.

Section 503, the nexus of the present dispute, provides for the allowance of "administrative expenses." In relevant part, administrative expenses are defined as "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services after the commencement of the case." Section 507 gives administrative expenses priority over all other unsecured claims.

The present controversy involves a claim which straddles the petition date. ETC and WMC contracted for ETC's employee relocation service prior to the filing date, but ETC's right to payment did not accrue until after the filing date. The problem is compounded by the fact that ETC continued to perform and incur expenses under its pre-petition obligations after the filing date. This Court is called upon to determine whether ETC's post-petition expenditures on pre-petition houses are attributable to the pre-filing or post-filing period. If attributable to the latter, then the expenditures claimed by ETC are administrative expenses entitled to priority under sections 503 and 507.

The policy underlying sections 503(b)(1)(A) and 507 is clear. "If a reorganization is to succeed, creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function." *In the Matter of Jartran*, 732 F.2d 584, 586 (7th Cir.1984). "Priority in payment is designed to assure payments, to the extent possible, to certain classes of claims by requiring that they first be paid before others are satisfied. In the main, expressions of priority, and the order of priority among priority claims themselves, are expressions of policy." 3 Collier on Bankruptcy ¶ 503.03, at 503–11 (15th ed. 1979).

Moreover, given the Bankruptcy Code's general principle of equality of distribution, priority may only be granted when it is clearly warranted:

> If one claimant is to be preferred over others, the purposes should appear from the pertinent statutes.... To prioritize ... claims where they are not clearly entitled to such treatment, is not only inconsistent with the policy of equality of distribution but it also dilutes the value of the priority for the claims of creditors Congress in fact intended to prefer.

*In the Matter of Chicago, M., St. P. & Pac. R. Co.*, 658 F.2d 1149, 1163 (7th Cir.1981) (citations omitted). *See also In re REA Express, Inc.*, 442 F.Supp. 71, 74 (S.D.N.Y. 1977) ("equitable considerations may not be relied upon to vary the strict priorities set out in [§ 503(b)(1)(A) ]").

Both parties recognize that the test enunciated in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976), should be applied in determining whether ETC's claim will be afforded priority under § 503:

> For a claim in its entirety to be entitled to first priority under § 64(a)(1) [the predecessor to § 503], the debt must arise from a transaction with the debtor-in-possession. When the claim is based upon a contract between the debtor and the claimant, the case law teaches that a

creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business. When third parties are induced to supply goods or services to the debtor-in-possession pursuant to a contract that has not been rejected, the purposes of § 64(a)(1) plainly require that their claims be afforded priority. It is equally clear that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing. Similarly, even when there has technically been performance by the contract creditor during the reorganization period, he will not be entitled to § 64(a)(1) priority if the bankrupt estate was not benefitted in fact therefrom.

*Id.* at 954 (citations and footnote omitted).

The *Mammoth Mart* test therefore requires that the debt both (1) arise from a transaction with the debtor-in-possession or, stated alternatively, that the consideration supporting the claim was supplied to the debtor-in-possession; and (2) be beneficial to the debtor-in-possession.

The test is "essentially an effort to determine whether the underlying statutory purpose will be furthered by granting priority to the claim in question...." *Jartran,* 732 F.2d at 587. The statutory purpose, of course, is to move creditors to extend credit to enable the bankrupt to function. Thus, creditors who provided consideration to the debtor prior to the filing date but whose claims arise post-petition are not members of the class of claimants which the Bankruptcy Code deems necessary for a successful reorganization. Full payment of such claims does not encourage creditors to furnish credit to enable the bankrupt to function. But "[w]hen third parties are *induced* to supply goods or services to the debtor-in-possession ... the purposes of [§ 503] plainly require that their claims be

afforded priority." *Id.* at 586 (quoting *Mammoth Mart,* 536 F.2d at 954). The "inducement" requirement is essentially an alternative statement of the first part of the *Mammoth Mart* test.

Applying the *Mammoth Mart* test, the Seventh Circuit in *Jartran,* 732 F.2d 584, held that the appearance of yellow pages advertisements during the post-petition period did not arise from a transaction with the debtor-in-possession, where the ads were placed before the petition was filed. The court explained that "inducement of the creditor's performance by the *debtor-in-possession* is crucial to a claim for administrative priority...." *Id.* at 587 (emphasis in original). *Accord In re Baths Int'l, Inc.,* 25 B.R. 538 (Bankr.S.D.N.Y. 1982).

The *Jartran* creditors, like ETC, argued that they supplied consideration to the debtor-in-possession because they had provided post-petition services under the pre-petition agreement. While recognizing that these additional services were beneficial to the estate, the court noted that the creditors neither alleged that *Jartran* had requested the post-petition services nor claimed that *Jartran* had a duty to prevent them from performing the post-petition services. "Thus, it was the pre-petition *Jartran* and not *Jartran* as debtor-in-possession that *induced* appellants to perform these services." *Jartran,* 732 F.2d at 587 (emphasis in original). The court left "to another day the problem of what sort of post-petition conduct by the debtor could lead to a conclusion that the contract had been affirmed and that the claimant was thus entitled to administrative priority." *Id.* at 591.

In sum, then, ETC's claim is entitled to priority as an administrative expense if: (1) it arose from a transaction with WMC as debtor-in-possession, by which WMC induced ETC to incur and accrue expenses on pre-petition houses; and (2) the consideration supplied by ETC was beneficial to WMC as debtor-in-possession.

B.

 Upon consideration, the bankruptcy court properly concluded that ETC's post-petition expenses for pre-petition houses are not administrative expenses. The debt in issue here did not arise from a transaction with the debtor-in-possession. ETC became obligated to meet expenses when it purchased an employee's residence. In fact, ETC would have performed this obligation even through apprised of an employer's financial difficulties, since it owed almost as great an obligation to the employee as to the employer. Under such circumstances, the statutory purpose of encouraging third parties to extend credit to the debtor would not be served. WMC, the debtor-in-possession, could not have induced ETC to incur expenses on pre-petition houses.

ETC's argument that WMC's insolvency constituted an anticipatory breach, and therefore that ETC was not obligated to continue paying expenses on pre-petition houses, is unavailing. ETC obviously did not consider WMC's insolvency as a breach because it continued to make the required payments on pre-petition houses. Moreover, ETC never asserted anticipatory breach upon learning that WMC had filed for reorganization. Even assuming it had done so, ETC still would have had a duty to mitigate damages by not making further payments. If it had, the present dispute never would have materialized.

 Finally, the bankruptcy court also properly held that the Second Contract impermissibly converted ETC's pre-petition claims into post-petition claims. It is entirely irrelevant that the Second Contract was in the "ordinary course of business" as that term is used in 11 U.S.C. § 363(c)(1). The Second Contract properly established a new working relationship between ETC and WMC as debtor-in-possession. WMC thereby became obligated to reimburse ETC for all expenses relating to houses purchased pursuant to the Second Contract. But since WMC was already obligated to meet expenses on pre-petition houses, the only effect of the Second Contract with respect to pre-petition houses, specifically section (E)(6), was to detail the method by which WMC reimbursed ETC. The Second Contract could not re-obligate WMC to reimburse ETC for pre-petition expenses. WMC's authority as debtor-in-possession simply did not empower it to alter ETC's non-priority status on its pre-petition claims. *Data-Link Systems, Inc. v. Whitcomb and Keller Mortgage Co., Inc.*, 715 F.2d 375 (7th Cir.1983).

IV.

For the above stated reasons, the bankruptcy court correctly concluded that ETC's post-petition expenses for properties purchased pre-petition are not administrative expenses, and the judgment of the bankruptcy court is affirmed.

IT IS SO ORDERED.