831 F.2d 106
 17 Collier Bankr.Cas.2d 1077, Bankr. L. Rep. P 72,026
In re WHITE MOTOR CORPORATION, Debtor,
EMPLOYEE TRANSFER CORPORATION, Plaintiff-Appellant,
v.
John T. GRIGSBY, Jr., Disposition Assets Trustee, Defendant-Appellee.
 No. 86-3564.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 22, 1987.
Decided Oct. 13, 1987.
 
 Joseph C. Domiano, Cleveland, Ohio, Michael S. Tucker (argued), for plaintiff-appellant.
 Pat E. Morgenstern-Clarren (argued), Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for defendant-appellee.
 Before KEITH and NORRIS, Circuit Judges, and PECK, Senior Circuit Judge.
 KEITH, Circuit Judge.
 
 
 1
 Appellant Employee Transfer Corporation ("ETC") appeals from a judgment by the district court in favor of White Motor Corporation ("WMC"), holding that ETC's claim for post-petition expenses relating to pre-petition obligations were not administrative priority expenses pursuant to 11 U.S.C. Sec. 503(b)(1)(A). 64 B.R. 586. For the reasons set forth below, we AFFIRM the decision of the Honorable Ann Aldrich, United States District Court for the Northern District of Ohio.
 
 
 2
 On November 11, 1971, ETC entered into a contract ("First Contract") with WMC to provide relocation services to WMC. Under the terms of the First Contract, ETC agreed to acquire and resell the residence of any WMC employee who was transferred and who accepted ETC's offer to buy his property. When informed about their transfers, WMC employees were provided with information about ETC's services. WMC then notified ETC if the employee wanted to utilize that service. ETC became obligated upon such notification to commence the process of establishing a fair price for the property and offering to buy it.
 
 
 3
 Through the offer process, ETC contacted the employee to arrange for appraisal of the property, ordered two independent appraisals, computed a fair market value and made an offer to buy the employee's residence at that fair market valuation. The employee then had fifteen days to accept the offer. If the offer was accepted, ETC paid the employee for his equity in the house and took title.
 
 
 4
 ETC was thereafter obligated to manage the property and to make payments for maintenance, the mortgage, insurance and utilities. Upon resale of the property, ETC billed WMC for all direct costs, including management and maintenance expenses, loss on resale, interest and service charges.
 
 
 5
 The parties operated under the original contract until approximately July 30, 1980. On May 28, 1980, ETC mailed WMC notice that the First Contract would be cancelled sixty days from that date. ETC and WMC then undertook efforts to negotiate a new contract, and ETC continued to perform the same services through October 10, 1980, the date of the new contract.
 
 
 6
 On September 4, 1980, WMC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The bankruptcy court authorized WMC to remain in possession and control of the property as debtor-in-possession, and to manage and operate its business affairs pursuant to 11 U.S.C. Secs. 1107 and 1108. Between July 28, 1980, and September 4, 1980, ETC purchased approximately eleven properties on an ad hoc basis. The present controversy concerns expenses incurred or accrued by ETC after the filing date with respect to these eleven properties purchased before the September filing date.
 
 
 7
 On or about October 10, 1980, the parties, without seeking Bankruptcy Court authority, signed a new agreement ("Second Contract") which purported to be effective the same date.[1] The Second Contract reaffirmed the working relationship between ETC and WMC. Section (E)(6), however, modified the terms upon which ETC billed WMC:
 
 
 8
 6. The terms of this agreement shall be applicable to each transaction initiated by ETC's purchase of employee property subsequent to July 31, 1960; provided, however, that the application of the 20% Fee Payment described in C.1 above shall be limited to those properties purchased by ETC on or after September 4, 1980; and those properties purchased by ETC subsequent to July 31, 1980 and prior to September 4, 1980 on which no 20% Fee Payment was made, expense incurred on or after September 4, 1980 including interest charged, by ETC, in connection with such properties shall be reimbursed on a monthly basis. All the transactions initiated by ETC purchases prior to August 1, 1980, shall continue to be governed by the prior agreement between the Company and ETC, except that effective September 4, 1980, expense, including interest charged, incurred by ETC in connection with such properties, shall be reimbursed on a monthly basis.
 
 
 9
 Joint Appendix at 61.
 
 
 10
 The district court determined that in essence Sec. (E)(6) of the Second Contract provided that WMC was to continue to reimburse ETC for expenses arising after WMC's filing of the bankruptcy petition even for residences purchased by ETC pre-petition.
 
 The parties further stipulated that:
 
 11
 8. The bankruptcy court did not ever specifically authorize WMC to enter into a Second Contract and such authority was not needed.
 
 
 12
 9. ETC acquired legal title to most of the parcels purchased by it under both the First Contract and the Second Contract, subject in some cases to the employee's mortgage and certain contractual restrictions. ETC acquired legal title prior to September 4, 1980, on all parcels listed on Exhibit C.[2]
 
 
 13
 10. ETC entered into contracts relative to each parcel listed on Exhibit C attached hereto prior to September 4, 1980.
 
 
 14
 11. The total amount expended and/or accrued by ETC prior to September 4, 1980 with respect to the parcels listed on Exhibit C is $573,751.16, exclusive of the interest to which ETC purports to be entitled.
 
 
 15
 12. The total amount expended and/or accrued by ETC after September 4, 1980 with respect to the parcels listed on Exhibit C [and not paid by WMC] is $236,146.38, exclusive of the interest to which ETC purports to be entitled.
 
 
 16
 13. Subsequent to September 4, 1980, WMC paid $843,034.47 to ETC for amounts expended and/or accrued by ETC in connection with the parcels listed on Exhibit C.
 
 
 17
 14. All amounts due to ETC by WMC under the Second Contract with respect to parcels acquired by ETC after September 4, 1980 has been paid in full. These amounts total approximately $800,000.00 exclusive of unpaid interest to which ETC purports to be entitled.
 
 
 18
 Joint Appendix at 62.
 
 
 19
 On May 5, 1981, ETC filed a proof of claim, and on November 9, 1982, it filed a motion to pay administrative expenses in the amount of $153,333.79. This motion was amended to seek recovery of $923,930.40 in administrative expenses. The claim was tried to the bankruptcy court on ETC's amended motion. At trial, ETC further amended its claim to seek recovery of $236,146.38 as administrative expenses and $573,751.16 as general unsecured debt. The trustee for WMC ("Trustee") contended that all amounts owed were general unsecured debt and that such debt had to be reduced by the amount incorrectly paid to ETC after WMC filed its petition in bankruptcy.
 
 
 20
 The bankruptcy court held that (1) the Second Contract could not effectively convert post-petition payments for pre-petition houses as expenses of administration; (2) post-petition payments expended or accrued by ETC on parcels purchased pre-petition were not administrative expenses; and (3) "ETC is entitled to a general, unsecured claim for $1,652,932, ignoring momentarily WMC's improper payments. The claim consists of the undisputed $573,751.16 for payments accrued pre-petition, $236,146.38 accrued in unpaid post-petition and $843,034.47 accrued and improperly paid post-petition." Joint Appendix at 50 and 51. The bankruptcy court then held that "[g]eneral, unsecured claims represented as Class II under WMC's confirmed [bankruptcy] plan had paid 43.5%". Thus, since ETC's receipt of $843,034.47 was 51% payment of its allowed claim, ETC was "entitled to no additional payment under the plan unless and until Class II claims have been paid 51%." Joint Appendix at 51.
 
 
 21
 ETC appealed to the United States District Court for the Northern District of Ohio, Eastern Division. On May 27, 1986, the district court affirmed the decision of the bankruptcy court, holding that the debt was not entitled to administrative priority. The court noted that (1) the debt did not arise from a transaction with the debtor-in-possession; and (2) the post-petition contract entered into by ETC and the debtor-in-possession could not effectively convert ETC's pre-petition debt into administrative expense entitled to priority payment.
 
 
 22
 On appeal, ETC initially contends that all post-petition expenses relating to pre-petition houses[3] are administrative expenses pursuant to 11 U.S.C. Sec. 503(b)(1)(A),[4] and are therefore entitled to priority under 11 U.S.C. Sec. 507(a)(1).[5] ETC asserts that its claim is entitled to priority as an administrative expense because it arose from a transaction with WMC as a debtor-in-possession. ETC contends that after the filing of the petition, WMC, as debtor-in-possession, requested that it continue to perform its service. It argues that this action created a new obligation, and its continued performance supplied consideration to the debtor-in-possession. ETC thus contends that the district court was clearly erroneous in finding that it had an obligation to WMC and its transferred employees after the date of WMC's filing to continue performing services on the employee's houses which had been sold prior to the filing. ETC also contends that it conferred a series of benefits upon WMC, including saving WMC maintenance, tax and insurance costs and improving employee relations.
 
 
 23
 The Trustee argues that ETC's interpretation of the Bankruptcy Code would convert pre-petition obligations into post-petition administrative expenses. He argues that ETC neither provided new consideration to the debtor-in-possession nor conferred specific and substantial benefits upon the debtor-in-possession. Although we feel that the services provided post-petition were beneficial to WMC as debtor-in-possession, we find that ETC's claims arise from commitments made before the debtor-in-possession came into existence.
 
 
 24
 The general policy of the Bankruptcy Code is to distribute all assets equitably. As found by the district court in the instant case, priority may only be granted pursuant to this policy:
 
 
 25
 If one claimant is to be preferred over others, the purposes should appear from the pertinent statutes ... To prioritize ... claims where they are not clearly entitled to such treatment, is not only inconsistent with the policy of equality of distribution but it also dilutes the value of the priority for the claims of creditors Congress in fact intended to prefer.
 
 
 26
 Joint Appendix at 68 (citations omitted).
 
 
 27
 The test for whether a claim qualifies for payment as an administrative expense is set forth in In re Mammoth Mart, Inc. 536 F.2d 950 (1st Cir.1976). In Mammoth Mart the court stated that a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceeding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate. Id. at 954.
 
 
 28
 A creditor provides consideration to the bankrupt estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. If the inducement came from a pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession. In re Jartran, Inc., 732 F.2d 584 (7th Cir.1984). However, if the inducement came from the debtor-in-possession, then the claims of the creditor are given priority. Id. at 586.[6]
 
 
 29
 In Jartran, a creditor sought administrative expense status for debts arising from a contract to place ads in Yellow Pages directories. The debtor placed orders for the advertising with the creditor, who in turn arranged for publication with the directories. The agreement provided that the debtor would not be billed for the ads until after publication. While the ads were placed and closed (i.e. the ads could not be withdrawn) prior to the date on which the debtor filed its bankruptcy petition, the ads were published after the petition date. Id. at 585.
 
 
 30
 The Seventh Circuit rejected the creditor's claim that this debt should be treated as an administrative expense, stressing that "the key fact is that the irrevocable commitment by [the parties] ... to place the ads was made before the filing of the petition in bankruptcy." Jartran, 732 F.2d at 586. The creditor argued in opposition that the publication date should determine the appropriate classification of the debt. In support, the creditor described some additional services that it performed post-petition with respect to ads placed pre-petition. Nevertheless, the court held that it was the pre-petition debtor that had induced the creditor to perform the service, stating that "no inducement by the debtor-in-possession was required because the liability for the costs of the ads was irrevocably incurred before the petition was filed." Id. at 588.
 
 
 31
 In this case, the district court held that WMC, as debtor-in-possession, did not induce ETC to incur expenses on pre-petition houses. The court noted that "ETC became obligated to meet expenses when it purchased an employee's residence." Joint Appendix at 71. The court further noted that "ETC would have performed this obligation even though apprised of an employer's financial difficulties, since it owed almost as great an obligation to the employee as to the employer." Id.
 
 
 32
 In response to the district court's holding, ETC argues that WMC's bankruptcy filing constituted an anticipatory breach by WMC of its contract with ETC. ETC argues that it was thus relieved of its obligations to pay post-petition expenses on the pre-petition houses, and it only agreed to make future expenditures based upon inducement with the debtor-in-possession. ETC further argues that because of the anticipatory breach, the bankruptcy court could not have forced it to expend sums post-petition.
 
 
 33
 We agree with ETC that WMC anticipatorily breached its contract with ETC when it filed for bankruptcy. However, we find that this breach does not have the effect of altering ETC's claim from an unsecured debt to an administrative priority debt. First, ETC's argument is unavailing because it was not raised in the trial court. Thus, on appeal ETC cannot now raise this argument before us. See Sigmon Fuel Co. v. TVA, 754 F.2d 162, 164-65 (6th Cir.1985).
 
 
 34
 Secondly, the fact is that ETC elected to perform; no court ordered it to do so. The testimony of John Clarke, an ETC employee who apparently handled the WMC account, clearly shows that ETC thought that it was required to continue to make post-petition expenditures, and it continued to do so. Joint Appendix at 90-92. Therefore, it is obvious that ETC did not regard WMC in anticipatory breach and did not agree to make future expenditures based upon inducement by the debtor-in-possession. Thus, the post-petition debt incurred by ETC constitutes an unsecured claim.[7]
 
 
 35
 ETC next argues that 11 U.S.C. Sec. 363(c)(1)[8] compels enforcement of the Second Contract, and that the district court improperly upheld the bankruptcy court's conclusion that the Second Contract impermissibly converted ETC's pre-petition claims into post-petition claims. ETC specifically argues that Sec. (E)(6) of the Second Contract created post-petition obligations for both parties with respect to pre-petition houses. ETC further claims that the contract was executed in the ordinary course of business and was not subject to bankruptcy court approval.
 
 
 36
 The Trustee argues that 11 U.S.C. Sec. 363 is irrelevant to the instant case. He further argues that even if the statute is relevant, the Second Contract cannot be in the ordinary course of business where it purports to convert pre-petition obligations into post-petition obligations. We agree with the Trustee's argument that the language in 11 U.S.C. Sec. 363 is irrelevant in this case.
 
 
 37
 The bankruptcy court properly stated that "[u]nder no circumstances can the debtor's authority to operate its business under Section 1108 of the Code or to use property of the estate in the ordinary course of business under Section 363 be interpreted or extended to permit the transformation of pre-petition debt to an administrative expense." Joint Appendix at 45. Section 363(c)(1) applies on its face only to postpetition transactions and does not speak to contracts which attempt to change prepetition obligations into post-petition obligations. The only part of this case in which Section 363 is even arguably relevant is the issue of whether the purchase of new properties post-filing was done in the ordinary course of business and thus did not require bankruptcy court approval. That issue is not before this court. The district court properly noted that "[t]he Second Contract properly established a new working relationship between ETC and WMC as debtor-in-possession ... [It] ... could not reobligate WMC to reimburse ETC for pre-petition expenses. WMC's authority as debtor-in-possession simply did not empower it to alter ETC's non-priority status on its pre-petition claims." Joint Appendix at 72 (citation omitted).
 
 
 38
 ETC finally argues that it has an equitable right to be compensated for the value of the post-petition services it performed on pre-petition houses. ETC contends that a contrary finding would result in unjust enrichment to WMC and thus frustrate the equitable principles underlying the congressional intent in establishing the reorganization provisions of the Bankruptcy Act. See American Anthracite and Bituminous Coal Corp. v. Arrivabene, 280 F.2d 119 (7th Cir.1960).
 
 
 39
 The Trustee argues that ETC's intention to be paid 100cents on the dollar for pre-petition houses would unjustifiably elevate it over other creditors who are similarly situated. We agree. The fundamental principle underlying the Bankruptcy Code is that all creditors should be treated equitably and no creditor should receive a distribution disproportionately greater than that received by other members of its class. In re Mammoth Mart, Inc., 536 F.2d at 953. ETC will share in the distribution to the same extent as the other general unsecured creditors. Any other treatment of ETC would permit it to receive an inequitably large proportion of the estate's assets in contravention of the bankruptcy laws. See In re Jartran, Inc., 732 F.2d at 590.
 
 
 40
 Accordingly, for the reasons set forth above, we AFFIRM the decision of the Honorable Ann Aldrich.
 
 
 
 [1]
 The parties stipulated that "[o]n or about October 10, 1980, Keith Mazurek, then president of WMC, signed, without bankruptcy authority, a contract with ETC purportedly effective October 10, 1980 ... ETC's position is that bankruptcy court authority was not needed." Joint Appendix at 61
 
 
 [2]
 The parcels listed in Exhibit C are those which were acquired by ETC prior to September 4, 1980. The exhibit is not attached to this opinion
 
 
 [3]
 The parties agree that ETC is a general, unsecured creditor with respect to $573,751.16 expended or accrued prior to the bankruptcy filing date, and that ETC is entitled to administrative priority with respect to the expenses for houses it purchased after the filing date. The present controversy concerns expenses incurred or accrued after the filing date with respect to houses purchased by ETC before September 4, 1980, and after the original contract had expired
 
 
 [4]
 Section 503(b)(1)(A) provides:
 (b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under Section 502(f) of this title, including--
 (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;
 
 
 [5]
 11 U.S.C. Sec. 507(a)(1) provides:
 (a) The following expenses and claims have priority in the following order:
 (1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.
 
 
 [6]
 "[W]hen third parties are induced to supply services to the debtor-in-possession ... the purpose of [Sec. 503] plainly requires that their claims be afforded priority." In re Jartran, Inc., 732 F.2d at 586 (quoting Mammoth Mart, 536 F.2d at 954.)
 
 
 [7]
 We note that the district court correctly found that:
 ETC obviously did not consider WMC's insolvency as a breach because it continued to make the required payments on pre-petition houses. Moreover, ETC never asserted anticipatory breach upon learning that WMC had filed for reorganization. Even assuming it had done so, ETC still would have had a duty to mitigate damages by not making any further payments. If it had, the present dispute never would have materialized.
 Joint appendix at 71 and 72.
 
 
 [8]
 11 U.S.C. Sec. 363(c)(1) provides:
 If the business of the debtor is authorized to be operated under Section ... 1108 ... of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.