### In re ARTESIAN INDUSTRIES, INC., Debtor.

### Bankruptcy No. 92–62018.

United States Bankruptcy Court, N.D. Ohio.

Feb. 3, 1995.

Bruce R. Schrader, II, Roetzel & Andress, Akron, OH, for trustee.

Leslie K. Wagner, Jr., Mansfield, OH, for claimants.

## MEMORANDUM OF DECISION

JAMES H. WILLIAMS, Chief Judge.

The matter before the court is an objection filed by the Chapter 7 trustee, Josiah L. Mason (Trustee), to proofs of claim presented by Kennard Meng (Meng), Charles Mistovich (Mistovich), Terry Simpkins (Simpkins) and David Rohe (Rohe) (collectively, the Claimants). Following a hearing, the court took the matter under advisement.

### I.

### FACTS

In 1991, Artesian Industries, Inc. (Artesian) was undergoing substantial financial difficulties. As a result of severe cash flow problems, it missed a payroll in August of that year, and as a result, its employees began questioning the continued viability of the company and many began to seek other employment. To help retain certain key management personnel, according to the Senior Vice President of Finance and a member of the Board of Directors, Artesian entered into severance pay agreements with eight of its executives, including the Claimants, on April 1, 1992. Under the terms of these agreements, each executive was to receive a certain percentage of his annual salary, plus 25% to compensate for lost benefits, if he was terminated by the company, other than for cause, within twelve months of the execution of the agreement. All of the agreements were unanimously approved by Artesian's board of directors, of which none of the Claimants was a member, on March 13, 1992. Star Bank, National Association (Star Bank), Artesian's principal lender, received copies of the agreements before they were executed. It neither approved of nor objected to the agreements.

Star Bank commenced a foreclosure action against the company on April 2, 1992, in the Richland County, Ohio Court of Common Pleas. A default judgment was entered against Artesian on June 26, 1992. At the outset of the foreclosure action, Star Bank moved for the appointment of a receiver to take possession of its collateral and to operate Artesian until such time as the company could be sold as a going concern. Fred B. Miller (Receiver) was appointed on April 2, 1992; his appointment was amended on April 8, 1992.

During the receivership, Artesian's management handled the day-to-day operations of the company. This arrangement allowed the Receiver to spend substantially all of his time attempting to secure a buyer for Artesian. He obtained authority from the state court on July 16, 1992, to transfer substantially all of Artesian's assets to NewArtesian Limited Partnership. The sale was completed on August 18, 1992, and the Receiver deposited $12,922,567.52 in proceeds from the sale into an account in his name. The Receiver then moved the state court to order the distribution of the proceeds. A hearing on the Receiver's motion was scheduled in the state court, but an involuntary petition under Chapter 7 of Title 11 of the United States Code, filed in this court on September 3, 1992, intervened.

Sometime before the end of April 1992, the Receiver became aware of the existence of the severance agreements. He neither affirmed nor disavowed them. In July and August 1992, he terminated the employment of the Claimants. (Meng's termination was effective on July 28, 1992; Simpkins and Mistovich were terminated on July 31, 1992; and the termination of Rohe was effective on August 1, 1992.)

From April 2, 1992, to August 17, 1992, the Receiver incurred various expenses to insure the continuation and operation of the business, to preserve Artesian's going concern value and to sell Artesian's assets to a third

party to pay Artesian's obligations to Star Bank. Star Bank provided some post receivership financing to Artesian which was used to pay some of these expenses. However, certain expenses, including the sums sought by Claimants, remain unpaid.

On October 20, 1993, this court issued a Memorandum of Decision and Order on a Motion for Partial Summary Judgment filed by the Trustee on his complaint to determine the validity, priority and extent of liens and encumbrances. The court held that "all of the debts incurred by the Receiver while he operated Artesian, which were for the preservation of the estate, the Receivership Expenses, are properly payable out of the proceeds of the sale of Artesian's assets." The court also held that the Receivership Expenses would be paid before Star Bank's pre-receivership secured claim. In a subsequent Memorandum of Decision and Order issued on January 28, 1994, the court reiterated its finding that "all Receiver's Expenses, which were for the preservation of Artesian's estate will take priority over Star Bank's pre-receivership claims."

The Trustee, with approval of the court, established a Receivership Proof of Claim procedure to determine the nature and extent of the unpaid Receiver's Expenses. The Claimants each filed a proof of claim asserting a right to receive severance pay. Meng filed a claim in the amount of $125,000.00;[1] Mistovich claimed $89,375.00;[2] Simpkins sought $43,750.00;[3] and Rohe filed a claim in the amount of $44,687.50.[4] The Trustee filed an omnibus objection to the severance claims of the Claimants.[5]

## II.

### DISCUSSION

#### A.

The court has jurisdiction in this matter by virtue of 28 U.S.C. § 1334(b) and General Order No. 84 entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R.Bankr.P. 7052.

The court must determine whether the Claimants' claims for severance pay fit within the definition of Receiver's Expenses as previously ordered paid by the court. As the parties have noted, the law in Ohio on receiverships, particularly on claims entitled to be treated as valid expenses of a receiver in the execution of his duties, is limited. The parties have thus suggested that case law relating to the allowance of administrative expenses in bankruptcy cases is applicable. The court will use such law by analogy but notes that it is not dispositive.

■ To establish a valid administrative expense under 11 U.S.C. § 503(b)(1)(A), a claimant must prove that the "debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2)

1. Under his severance agreement, Meng was entitled to receive 125% of his annual salary as of the date of his termination. His salary on that date was $100,000.00 per year.

2. Under his severance agreement, Mistovich was entitled to receive 125% of his annual salary as of the date of his termination. His salary on that date was $71,500.00 per year.

3. Simpkins originally filed a proof of claim in the amount of $89,375.00. At the hearing, he indicated that this amount was incorrectly based on 100% of his salary plus 25%. Under his severance agreement, Simpkins was entitled to receive 62.5% of his annual salary as of the date of his termination (50% of his salary plus 25%). His salary on that date was $70,000.00 per year. Thus, at the hearing, Simpkins orally amended his proof of claim to $43,750.00.

4. Rohe originally filed a proof of claim in the amount of $89,375.00. At the hearing, he indicated that this amount was incorrectly based on 100% of his salary plus 25%. Under his severance agreement, Rohe was entitled to receive 62.5% of this annual salary as of the date of his termination (50% of his salary plus 25%). His salary on that date was $71,500.00 per year. Thus, at the hearing, Rohe orally amended his proof of claim to $44,687.50.

5. All eight of Artesian's executives who were covered under severance pay agreements filed receivership proofs of claim. The Trustee objected to all of these claims. However, only the Claimants responded to the Trustee's objections. Thus, the Trustee's objection to the claims of the other four executives has been sustained.

that it directly and substantially benefited the estate." *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir.1987) (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976). Both requirements must be met for a claim to qualify as an administrative expense.

### B.

The court will not address the issue of whether the severance pay obligation arose from a transaction with the Receiver because it finds that the Claimants gave consideration.[6] To be eligible to receive severance pay, an executive had to continue working for Artesian until termination. If he decided to leave the company before he was terminated, his right to severance pay lapsed. Thus, the consideration for the contract was remaining with the company until terminated. Indeed, the purpose of the severance agreements was to retain key management personnel of Artesian to either reorganize it or to maximize the value of its assets as a going concern for the benefit of its creditors. The court finds that the Receiver, by taking no action with respect to the agreements, effectively induced the required performance under agreements by the Claimants.

The evidence indicates that the Claimants remained with Artesian because of the severance agreements. Each of them refused to explore other employment opportunities after the contracts were executed because each believed that it was important to the future viability of Artesian to devote 100% of his time and energies to the company's business. Each of the Claimants testified that he had been approached by "headhunters" during the receivership period but had declined to pursue any discussions relative to other employment. The Claimants maintain they relied on the fact that the Receiver knew about the agreements but failed to indicate that they would not be honored.

Counsel for the Trustee argues that the Claimants did not give consideration to the

Receiver because the latter did not induce their performance. *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984). However, the facts in this case are distinguishable from those in *Jartran*. In *Jartran*, a creditor sought administrative expense status for debts that arose from a contract to place ads in Yellow Pages directories. The contract to place the advertisements was entered into prepetition but the advertisements ran post-petition. The Seventh Circuit rejected the creditor's argument that its claim was entitled to administrative expense status, stressing that "the key fact is that the irrevocable commitment by [the parties] ... to place the ads was made before the filing of the petition in bankruptcy." *Jartran*, 732 F.2d at 586. The court held that the prepetition debtor had induced the creditor to run the advertisements, stating that "no inducement by the debtor-in-possession was required because the liability for the costs of the ads was irrevocably incurred before the petition was filed." *Id.* at 588. The consideration given by the creditor was the promise to run the advertisements that the debtor submitted. This consideration was given prepetition because the promise was made prepetition.

In the present case, the Claimants were not bound to perform services for Artesian. Each of them was free to leave Artesian at any time. If any of them had left the company before being terminated, he would not have been entitled to any severance pay. Thus, the Claimants gave consideration to the Receiver by remaining with Artesian until terminated.

Counsel for the Trustee also cites *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 712–13 (Bankr.S.D.N.Y.1992), to support the contention that the Receiver did not induce the performance of the Claimants. However, the facts in *Drexel* are also distinguishable. In *Drexel*, its general counsel, who signed a four year employment contract approximately ten months before the corporation filed its bankruptcy petition, sought,

---

6. The court does note that it is difficult to determine with whom a transaction relating to severance pay arose. In this case, Artesian entered into the agreements, but the Receiver actually terminated the Claimants thereby triggering their

right to severance pay under the agreements. If the Receiver had not terminated the Claimants or if the Claimants had left Artesian before being terminated, no severance pay obligation would have arisen.

inter alia, severance pay under the terms of the contract in the amount of approximately three years' salary and bonuses totaling approximately $3.7 million. The court found that any inducement was made prepetition and thus denied administrative status for the severance pay claim. *Id.* The general counsel remained with Drexel after it filed its petition because he was under contract to do so.

In the present case, the Claimants were not obligated to remain with the company pursuant to an employment contract. They could have left the company at any time without being in breach of contract as general counsel for Drexel would have been if he had left. The claimants, while they were free to depart for greener pastures, elected not to do so and the Receiver's silence led them to conclude that they could rely on the severance agreements.

At the hearing, counsel for the Trustee stressed the fact that the Claimants did not assume any additional responsibilities after the Receiver was appointed as further support for his contention that the severance pay is a pre-receivership obligation. This contention misconstrues the purpose of the severance agreements. The purpose was not to compensate the Claimants for additional work they had to assume because of Artesian's severe financial problems. Rather, it was to retain Artesian's key management despite those problems. It is irrelevant whether the Claimants assumed greater responsibilities after they signed the severance agreements. The key fact is that each of the Claimants remained with Artesian and continued to devote 100% of his efforts toward preserving the company as a going concern.

### C.

■ The Trustee does not dispute the contention that retaining key executives was crucial to the sale of Artesian as a going concern. Without the severance agreements, Artesian's management team quite likely would not have remained in place and the Receiver would probably have been forced to liquidate the company on a piecemeal basis, resulting in the loss of jobs and, presumably, a substantially smaller realization by the estate from such a liquidation. The evidence indicates that the retention of Artesian's management through the period of the receivership was important to the company's customers and vendors. Thus, the court finds that the severance agreements and the debt incurred pursuant to the same directly and substantially benefited the receivership estate.

In view of the importance of the Claimants to the sale of Artesian as a going concern, the Receiver and Star Bank clearly had a strong interest in the retention of the Claimants. If severance agreements had not been in place, it is arguable that the Receiver would have been compelled to offer some incentive to the Claimants to retain them. He was obligated to take steps to preserve Artesian's assets as a going concern, including the retention of necessary personnel and no argument is made that the Claimants were not necessary.[7]

If Artesian had been brought into bankruptcy prior to the appointment of the Receiver and sale of its assets, the Trustee would have been in the same position as that of the Receiver discussed above. His option to liquidation would have been to maintain operations long enough to effect a going concern sale in order to maximize the value of Artesian's assets for the benefit of its creditors and the Claimants were critical to those operations. It is inappropriate, if not disingenuous, now to denigrate the value of the retained services of the Claimants for the period of the receivership.

### D.

Counsel for the Trustee argues that this case is substantially similar, if not identical, to *In re Uly–Pak, Inc.,* 128 B.R. 763 (Bankr.

---

7. The state court ordered the Receiver to "continue to operate Artesian to the extent reasonably possible, in a manner which protects its value as a going concern ..." until Artesian was sold to a third party. The Receiver's powers included the authority to "employ all officers, managers, employees and agents he deem[ed] necessary and proper in the furtherance of Artesian's business...." The severance agreements in place spared the Receiver any need to offer any incentives aimed at the retention of the Claimants.

S.D.Ill.1991). In *Uly–Pak*, an executive of the debtor sought administrative expense status for his severance claim. The bankruptcy court denied such status because it found that the "severance pay neither arose from a transaction with the debtor in possession nor benefited the debtor in possession in the operation of the business." *Id.* at 766. The court also noted that because the claimant would have been entitled to the full amount of his severance pay had he been terminated prior to the filing of the debtor's bankruptcy petition, the claimant "earned" the severance pay prepetition. *Id.* at 767. This court cannot entirely agree with this analysis. If the claimant had "earned" his severance pay prepetition, which was before he was terminated, he should have been entitled to receive the severance pay if he left the company prior to being terminated. It is extremely unlikely that such would have occurred.

In addition to disagreeing with the court's reasoning in *Uly–Pak*, this court believes that a key fact in *Uly–Pak*, which does not exist here, and therefore distinguishes it, is the fact that the executive in *Uly–Pak* was the president and chief executive officer and a 25% shareholder of the debtor. As such, he had significant influence over the debtor's decision to execute the severance pay agreement which created a potential conflict of interest. *Id.* at 768. In addition, the claimant was in a position to influence the debtor-in-possession to remain silent about his employment contract thereby leaving the issue of his priority status open for later determination. *Id.*

In the present matter, the Claimants were neither shareholders nor members of the board of directors of Artesian. As such, there was no potential conflict of interest relating to their severance agreements which were approved by Artesian's board of directors. In addition, they did not possess any particular ability to influence the Receiver to remain silent about their employment contracts. That the Claimants were members of Artesian's management committee, and were therefore aware of the company's financial problems, is not, as the Trustee argues, fatal to their claims for severance pay. The key issue in *Uly–Pak* was the influence that the president had on the debtor, not his knowledge of its financial difficulties. Knowledge of such difficulties only makes a severance agreement more important. The very knowledge of the Claimants of Artesian's financial problems created the company's need to provide an incentive for them to stay. Without the severance agreements, it is likely that the Claimants would have either left Artesian immediately or started looking for other employment thereby diverting a substantial portion of their time and energies from preserving Artesian as a going concern. As has been previously discussed, the Claimants' complete dedication toward preserving Artesian as a going concern was extremely critical to protecting the interests of creditors.

The court in *Uly–Pak* also noted:

There is a further policy consideration involved in denying administrative expense treatment to this type of severance pay. An employer on the verge of bankruptcy could insert such a severance pay clause into an employment contract, knowing in advance that the resulting severance pay would be granted priority status. By doing so, the employer could favor certain employees over other legitimate creditors. *Id.* at 768–69 (citation omitted).

This concern does not exist in this case. As the court noted above, the purpose of the severance agreements was to retain the key management of Artesian and their retention was critical to the sale of Artesian's assets as a going concern which benefited Artesian's creditors and preserved jobs in the community. Thus, the severance pay agreements do not amount to an improper preference of the Claimants over Artesian's other legitimate creditors.

The Trustee's objection to the claims of the Claimants as valid receivership expenses should be denied. An order in accordance with the foregoing shall issue forthwith.

### ORDER

For the reasons set forth in the accompanying Memorandum of Decision, the court finds the objections of the Chapter 7 Trustee, Josiah L. Mason, to the claims of Kennard

Meng (Claim No. 680 for $125,000.00), Charles Mistovich (Claim No. 685 for $89,-375.00), Terry Simpkins (Claim No. 679, as orally amended at hearing, for $43,750.00) and David Rohe (Claim No. 689, as orally amended at hearing, for $44,687.50) not to be well taken and the same should be, and hereby are, **OVERRULED** and said claims are hereby allowed.

IT IS SO ORDERED.