**In re PIERCE COAL AND CONSTRUC-TION, INC., Debtor.**

**Bankruptcy No. 81–00263–C.**

United States Bankruptcy Court, N.D. West Virginia.

Sept. 15, 1986.

See also, Bkrtcy., 49 B.R. 779.

Robert G. Durnal, Junior, W.Va., Chapter 7 trustee.

Charles A. Baer, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., Martin P. Sheehan, Asst. U.S. Atty., Wheeling, W.Va., for I.R.S.

Robert J. Blumling and John L. Spiegel, Plowman & Spiegel, Pittsburgh, Pa., for Trans-America Ins. Co.

William D. Wilmoth, Wheeling, W.Va., for debtor.

William Dean, U.S. Dept. of Justice, Tax Div., Washington, D.C., Julia Chincheck, Charleston, W.Va., for Great Lakes Carbon.

Robert M. Amos, Fairmont, W.Va., for Richard and Lynna White.

Robert Trumble, Clarksburg, W.Va., for Jack and Ellen Lambert.

## MEMORANDUM OPINION AND ORDER

L. EDWARD FRIEND, II, Bankruptcy Judge.

On the 28th day of January, 1986, hearing was had on the Request of Transamerica Insurance Company for Allowance and Payment of Chapter 7 and Chapter 11 Administrative Expenses. Present were Robert G. Durnal, Chapter 7 trustee; William D. Wilmoth, counsel for the debtor; Robert J. Blumling and John L. Spiegel, counsel for Transamerica Insurance Company; William Dean, United States Department of Justice, Tax Division; Julia Chincheck, counsel for Great Lakes Carbon; Robert M. Amos, counsel for Richard and Lynna White; and Robert Trumble, counsel for Jack and Ellen Lambert. The Court heard the testimony presented, then took the matter under advisement and requested counsel to submit memoranda of law on the issue of whether Transamerica Insurance Company's request for reimbursement of $261,000.00 in bond forfeitures due to the alleged environmental violations committed by the debtor and the Chapter 7 trustee is an administrative expense.

## FACTS

On April 8, 1981, Pierce Coal & Construction, Inc., (hereinafter sometimes referred to as "debtor" or "Pierce"), filed its voluntary petition for reorganization under Chapter 11. On that day, an order was entered authorizing the debtor in possession to operate its business, mining coal by the surface mining method. The debtor, while engaged in its prepetition mining business, was required by the State of West Virginia to procure mining permits and to post bonds with the State of West Virginia, Department of Natural Resources, (hereinafter sometimes referred to as "DNR"), now the Department of Energy. West Virginia Mining Conservation and Reclamation Act, W.Va.Code § 22A–3–1 et seq.

The debtor had secured four permits authorizing operations in Union District, Upshur County, from the State and had purchased surface mining reclamation bonds issued by Transamerica Insurance Company (Transamerica) as surety to cover each of the four permit sites. The bonds were issued in favor of the DNR as obligee with the debtor as the designated principal under each bond. The permits and bond amounts were issued as follows:

| Permit No. | Bond No. | Bond Amount | Date Issued |
|---|---|---|---|
| 112–79 | 5212–55–30 | $ 80,000.00 | 1979 |
| 36–79 | 5212–40–43 | 107,000.00 | 1979 |
| 100–78 | 5212–25–14 | 47,000.00 | 1978 |
| 94–78 | 5212–25–15 | 27,000.00 | 1978 |

The debtor operated as a debtor in possession until May 6, 1982, when the Court approved the debtor's motion to convert its Chapter 11 proceeding to a case under Chapter 7. Robert G. Durnal was appointed Chapter 7 trustee. On May 14, 1982, the trustee was authorized by Court order to operate the business of the debtor for a period not to exceed thirty (30) days from the date of conversion of the case to a Chapter 7. On June 18, 1982, a telephonic conference was had on the trustee's motion to continue operating the business, which motion was denied. The operation of the business by the trustee terminated at the close of business on June 18, 1982.

As a result of operations, the DNR revoked the four permits because of allegedly inadequate land reclamation, and made demand of Transamerica in the amount of $261,000.00, the total sum of the four bonds issued by Transamerica. Transamerica forfeited the sums owing under the bonds.

On June 6, 1985, this Court issued a notice of the trustee's request to pay certain Chapter 7 and Chapter 11 administrative expenses. On June 27, 1985, Transamerica filed an objection to the trustee's request asserting that its claim against the debtor's estate arising from the bond forfeitures was also entitled to administrative expense priority and should be paid on a pro rata basis with other administrative expense creditors. On that same date, Transamerica also filed its "Request for Allowance and Payment of Both Chapter 7 and Chapter 11 Administrative Expenses".

At the hearing held on January 28, 1986, Michael G. Reese, a surface mine reclamation inspector with the Department of Energy, State of West Virginia, testified that during the operation of the debtor's business, he inspected the mining sites every fifteen days checking top soil, drainage control, blasting, water quality, regrading, etc. Tr. at 20, 21. He testified as to each of the permits and the violations he observed.

### Permit 112–79

Extensive mining operations under Permit 112–79 were conducted from April, 1981, until September, 1982. Reese observed violations in back filling, regrading, drainage, and revegetation requirements. Tr. at 27, 28, 31, 34. The violations observed were not corrected and have not been corrected to date. Tr. at 29, 34, 35. Although some efforts were made to comply with environmental regulations, the efforts were not sufficient. Tr. at 31. During the bankruptcy period, sixteen (16) additional acres were disturbed by the mining operation. Tr. at 35. In Reese's opinion, the violations described resulted in the revocation of the permit and the forfeiture of the surety bond. Tr. at 29, 35, 37. On cross-examination, Reese testified that none of the four mining sites were in compliance prior to the filing of the Chapter 11 petition in April, 1981. Tr. at 47. The majority of acreage was disturbed prior to the bankruptcy, with approximately 10% of the disturbance being caused during the bankruptcy. Tr. at 52, 53. Also, throughout the bankruptcy, reclamation efforts had improved. Tr. at 49.

### Permit 36–79

According to Reese, as of August, 1981, environmental violations that existed in permit area 36–79 included violations of back filling, regrading and other general reclamation requirements, which violations have not been corrected to date. Tr. at 38. It was his opinion that since the debtor's filing, approximately ten (10) additional acres (10% of the total permit acreage) were disturbed in this area. Tr. at 40. During cross-examination, Reese agreed that none of the disturbance in this area was incurred subsequent to the conversion of the debtor to Chapter 7 in May, 1982. Tr. at 53, 54.

### Permit 94–78

Reese testified that there was total environmental disturbance in permit area 94–78 consisting of failure to revegetate and acid mine drainage and that these violations ex-

ist today. Tr. at 38, 41, 55, 62. Again, it was his opinion that these violations led to forfeiture of the surety bond. Tr. at 40. Testimony on cross-examination revealed that this permit area had been disturbed prior to the bankruptcy and had not been reclaimed or revegetated during the bankruptcy. Tr. at 55.

### Permit 100–78

According to the testimony, regrading and revegetation work should have been performed in this permit area, Tr. at 42, 43, and equipment that was located on the site and used by the debtor throughout the bankruptcy for crushing rock had to be dismantled and removed for compliance at an additional cost. Tr. at 35–37, 42, 44, 54. Reese testified that the rock crushing operations were presently being operated by R & R Coal Contractors and had been since 1983. Disturbance caused by R & R Coal Contractors was minimal and did not affect the decision to require forfeiture of the bond. Tr. at 35, 36, 37. On cross-examination Reese admitted that no additional acreage was disturbed in this area from April of 1981 through May of 1982 and that only the rock crushing unit was being operated. The regrading and revegetation violations still exist. Tr. at 42. It was Reese's opinion that permit areas 94–78 and 100–78 would require the same amount of reclamation today as would have been required in April, 1981. Tr. at 54, 55. Additional reclamation from April, 1981, would be required on permit areas 112–79 and 36–79. Tr. at 56. He was further of the opinion that there was significantly more disturbance of land prior to the bankruptcy period and that reclamation efforts were better during the Chapter 11. Tr. at 48, 49.

In summary, Reese testified that the debtor failed to comply with an ongoing regulatory obligation to backfill, regrade, revegetate and generally reclaim the four permit sites throughout the bankruptcy. Tr. at 45, 61–64. Although the debtor did make some effort to reclaim areas 36–79 and 112–79, reclamation was not successful because it was not completed. Tr. at 62,

65. On rebuttal, Reese stated that throughout the Chapter 11 proceeding, the debtor was not concurrent with environmental regulations. Tr. at 116.

Rodney W. Clay, President of Green Mountain Company, a reclamation and construction firm, was contracted by Transamerica to review the permit sites in question for the purpose of estimation of reclamation costs. Tr. at 70. Based upon his study, it was Clay's opinion that reclamation could not be effected on any of the permit areas to bring them into compliance with environmental regulations for less than the amount of the bond covering each permit. Tr. at 72–74.

J. Gregory Hanner, employed by the debtor as Vice President in charge of production shortly after the debtor's petition was filed, testified as to what measures the debtor undertook to try to comply with the State's environmental regulations. He testified that reclamation efforts were ongoing prior to and during the filing of the Chapter 11 petition, Tr. at 87, 88, 99, 102–105, but that reclamation efforts could have been kept more current during mining operations prior to the Chapter 11 and during the Chapter 11. Tr. at 108. However, Hanner was of the opinion that overall more land was reclaimed during the reorganization than was disturbed, Tr. at 109, although the four permits in question may not have received the greatest percentage of reclamation. Tr. at 110, 111. Citations or notices of noncompliance for not being concurrent in reclamation efforts were issued to the debtor on the four permit areas at issue, but Hanner and Reese worked most things out according to their satisfaction at the time. Tr. at 113. Removal of the rock crusher subsequent to the filing of the bankruptcy did not increase the expense of removing the crusher. Tr. at 89, 90. Hanner estimated that the cost of reclamation for permit areas 112–79 and 36–79 would have exceeded the amount of the bonds prior to April, 1981. Tr. at 97, 99.

Counsel for Transamerica asserts that if the debtor in possession avails itself of ongoing operations during the Chapter 11,

all prior disturbances should be corrected and paid as Chapter 11 administrative costs. Here, the corresponding failure to reclaim the land disturbed during and prior to the Chapter 11, which responsibility does not cease with the filing of bankruptcy, resulted in forfeiture of the bonds. Upon Transamerica's payment of the forfeiture of those bonds, it is entitled to subrogate to the DNR's position and receive distribution on a prorata basis with other Chapter 11 and Chapter 7 administrative creditors.[1] Tr. at 123, 125, 128, 129.

The trustee asserts that as of April, 1981, when the first bankruptcy petition was filed, the cost to reclaim the land already exceeded the sum on the bonds, and that the additional work did not increase Transamerica's obligations. Therefore, Transamerica should not be entitled to an administrative expense. Tr. at 133. As to permit areas 94–78 and 100–78 where no surface disturbance occurred during the Chapter 11, the entire reclamation expense would be a prepetition expense and the bond holder would be an unsecured creditor in the estate. Tr. at 131.

## DISCUSSION

The parties have impliedly agreed through their memoranda that there is no question that Transamerica in its capacity as being subrogated to the State of West Virginia makes its claim through the State of West Virginia. That is, Transamerica is seeking to have an administrative priority claim for the amount it pays to the State of West Virginia by virtue of the forfeited bonds. The forfeiture pursuant to W.Va. Code 22A–3–11 by the debtor created an obligation on the part of Transamerica to pay to the State of West Virginia the sum of money represented by the bonds, i.e., $261,000. To simplify the discussion of the case, the question becomes one of whether the State of West Virginia would have a claim against the assets of the debtor for payment of damages to the environment. Obviously, Transamerica can receive no

greater right on its subrogated claim than the State of West Virginia would have.

The section granting administrative expense category is 11 U.S.C. § 503 which provides for the allowance of administrative expenses for the following:

"The actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered *after the commencement of the case.*" (Emphasis added.)

There have been several decisions regarding the effect of bankruptcy on environmental costs and hazards and the interaction of various federal code sections upon the debtors in possession and trustees' duties relating to environmental damage. Title 28 U.S.C. § 959(b) requires that a trustee, including a debtor in possession,

"shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the state in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof".

In 1968, the United States Supreme Court considered the claim for administrative priority of a party whose property was damaged by the post-petition operations of a debtor in possession. *See, Reading Company v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). The Court found that "preserving the estate" includes the larger objective common to arrangements of operating the debtor's business with a view toward rehabilitating it. Therefore, the damages done during the postpetition operation of the bankruptcy were entitled to an administrative priority claim. The court considered 28 U.S.C. § 959(b) and concluded that the provisions established only the principle of liability under state tort and agency law, and did not establish from whom or with what priority tort claims may be collected. *Reading Co., supra,* pages 477–78, fn. 7, 88 S.Ct. pages

---

**1.** It is Transamerica's position that the DNR and the State of West Virginia would have an administrative priority for damages to the land occurring post-petition. Tr. at 125, 128.

1762–63 fn. 7. The court concluded that the tort claims that arose during the arrangement were actual and necessary expenses of the arrangement rather than debts of the bankrupt.

In *Penn Terra Ltd. v. Dept. of Environ. Resources*, 733 F.2d 267 (3rd Cir.1984), the court considered an action by Pennsylvania Department of Environmental Resources against the debtor to correct violations of state environmental statutes. The Third Circuit held that the actions by the environmental agencies were an exercise of the police power within the provisions of Bankruptcy Code § 362(b)(5) and, therefore, not within the restraints of the stay provisions of the Bankruptcy Code, 11 U.S.C. § 362. The court concluded that the suit brought by the Pennsylvania environmental agencies to compel Penn Terra to remedy environmental hazards was properly brought as an equitable action to prevent future harm, and did not constitute an action to enforce a money judgment. Therefore, the automatic stay provisions of § 362 were not applicable.

In *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Supreme Court considered an agreed judgment order entered into by the debtor and the State of Ohio whereby the debtor agreed to a stipulation of the following: enjoining him from further polluting the air or public waters; forbidding him from bringing additional industrial wastes onto the site; requiring him to remove specific waste from the property; and ordering the payment of $75,000 to the State. After this judgment was entered by agreement, the debtor filed a personal bankruptcy petition. The question presented to the Supreme Court was whether or not the judgment order was, in fact, a claim. The Court held that it was a claim as defined by Bankruptcy Code § 101(4)(B) which states as follows:

4(B) "Claim" means right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The Supreme Court determined that under the above section, the claim of the State of Ohio was, in fact, a claim of an obligation to pay money and was, thus, dischargeable in bankruptcy. The Supreme Court agreed with the lower decisions that the injunctive order was essentially a monetary obligation:

"As we understand it, the Court of Appeals held that, in the circumstances, the cleanup duty had been reduced to a monetary obligation. We do not disturb this judgment. The injunction surely obliged Kovacs to clean up the site. But when he failed to do so, rather than prosecute Kovacs under the environmental laws or bring civil or criminal contempt proceedings, the State secured the appointment of a receiver, who was ordered to take possession of all of Kovacs' nonexempt assets as well as the assets of the corporate defendants and to comply with the injunction entered against Kovacs. As wise as this course may have been, it dispossessed Kovacs, removed his authority over the site, and divested him of assets that might have been used by him to clean up the property. Furthermore, when the bankruptcy trustee sought to recover Kovacs' assets from the receiver, the latter sought an injunction against such action. Although Kovacs had been ordered to 'cooperate' with the receiver, he was disabled by the receivership from personally taking charge of and carrying out the removal of wastes from the property. What the receiver wanted from Kovacs after bankruptcy was the money to defray cleanup costs. At oral argument in this Court, the State's counsel conceded that after the receiver was appointed, the only performance sought from Kovacs was the payment of money. Tr. of Oral Arg. 19–20. Had Kovacs furnished the necessary funds, either before or after bankruptcy, there seems little doubt that the receiver and the State would have been satisfied. On the facts before it, and with the receiver in

control of the site, we cannot fault the Court of Appeals for concluding that the cleanup order had been converted into an obligation to pay money, an obligation that was dischargeable in bankruptcy."

Further the Supreme Court set forth specifically what it did *not* decide:

"It is well to emphasize what we have not decided. First, we do not suggest that Kovacs' discharge will shield him from prosecution for having violated the environmental laws of Ohio or for criminal contempt for not performing his obligations under the injunction prior to bankruptcy. Second, had a fine or monetary penalty for violation of state law been imposed on Kovacs prior to bankruptcy, § 523(a)(7) forecloses any suggestion that his obligation to pay the fine or penalty would be discharged in bankruptcy. Third, we do not address what the legal consequences would have been had Kovacs taken bankruptcy before a receiver had been appointed and a trustee had been designated with the usual duties of a bankruptcy trustee. Fourth, we do not hold that the injunction against bringing further toxic wastes on the premises or against any conduct that will contribute to the pollution of the site or the State's waters is dischargeable in bankruptcy; we here address, as did the Court of Appeals, only the affirmative duty to clean up the site and the duty to pay money to that end. Finally, we do not question that anyone in possession of the site—whether it is Kovacs or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or the bankruptcy trustee—must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions."

In the concurring opinion by Justice O'Connor, the Justice gives advice on how a state could protect its claim.

" ... Thus, a State may protect its interest in the enforcement of its environmental laws by giving cleanup judgments the status of statutory liens or secured claims."

The Third Circuit, in the case of *Matter of Quanta Resources Corp.*, 739 F.2d 912 (3rd Cir.1984), aff'd *sub nom. Midlantic National Bank v. New Jersey Department of Environmental Protection,* — U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), held that the trustee could not abandon contaminated property in contravention of state law where there may be severely deleterious implications for the public safety. The court attempted to balance the public policy of abandonment and preserving as much of the estate as possible for distribution to creditors and the public policy set forth in the environmental protection laws to protect the health and safety of the citizenry. It was undisputed that the compliance with hazardous waste disposal laws would require substantial expenditures, thus depleting the assets of the estate available for distribution to creditors. The court expressed its position on the public policy as follows:

"But the extent (unproven in these proceedings) of the expenditures necessary to dispose of the waste properly is not in itself sufficient to outweigh the public interest at stake here. It is only recently that the public has learned of the magnitude of the dangers associated with toxic waste disposal; at the same time, the last few years have witnessed a rising tide of bankruptcies. Lurking in the shadows of these phenomena is the spectre of the changing fortunes of the nuclear power industry, with the concomitant potentiality for unusable facilities. If trustees in bankruptcy are to be permitted to dispose of hazardous wastes under the cloak of the abandonment power, compliance with environmental protection laws will be transformed into governmental cleanup by default. It cannot be said that the bankruptcy laws were intended to work such a radical change in the nature of local public health and safety regulation—the substitution of governmental action for citizen compliance—without an indication that Congress so

intended. The supremacy clause does not require the suspension of the operation of New York's hazardous waste disposal laws."

*Quanta,* pp. 921–22.

The *Quanta* court, however, upon request by the state of New York that it be reimbursed its clean-up costs as an administrative expense under 11 U.S.C. § 503(b) and § 507(a) indicated that the only relevant category would be § 503(b)(1)(A) "actual, necessary costs of preserving the estate", but refused to decide the issue of priority as it was not before the court at that time. There was no finding by the Third Circuit as to its position with regard to administrative expense priority.

The Supreme Court in considering the *Quanta* case on appeal, *Midlantic Nat. Bank v. N.J. Dept. of E.P.,* — U.S. —, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) affirmed the Third Circuit. The court held that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from *identifiable hazards,* and that Congress intended that the trustee's efforts to marshal and distribute the assets of the bankruptcy estate must yield to recognized government interest in the public health and safety. The Supreme Court did not rule on the question of whether or not the expenses would be administrative expenses inasmuch as this issue was not before it from the Third Circuit. The court reaffirmed the position taken in *Ohio v. Kovacs, supra,* that a firm may not maintain a nuisance, pollute the waters of the state, or refuse to remove the source of such condition. This applies to anyone in possession of the property whether it is a debtor in possession or a trustee.

In a footnote, the United States Supreme Court stated as follows:

"This exception to the abandonment power vested in the trustee by Section 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. *The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm."* (Emphasis added.)

*Midlantic,* 106 S.Ct. at 762–63.

A review of other decisions reveals as follows: In *In re Stevens,* 53 B.R. 783 (Bankr.Ct.Me.1985), the court determined that a trustee may abandon hazardous waste under 11 U.S.C. § 554(a), that the cost of environmental cleanup inherited by a trustee is not an administrative expense under 11 U.S.C. § 503(b)(1)(A) and that the claim of the state for the environmental costs was an unsecured claim. The first holding that the trustee may abandon the hazardous waste has been limited by the United States Supreme Court. The remaining findings, however, have not been directly addressed by the Supreme Court.

In the case of *In re T.P. Long Chemical, Inc.,* 45 B.R. 278 (Bankr.Ct.N.D. Ohio 1985), the court considered expenses incurred by the Environmental Protection Agency under the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 (CERCLA) 42 U.S.C. § 9601, *et seq.* The EPA had filed an application to be reimbursed by the estate for the costs which it incurred when certain hazardous materials were found on property of the debtor which had been sold previously by the trustee. There were drums containing hazardous substances discovered on the estate after the sale of the property by the trustee. The court determined that the debtor's estate was liable to the EPA under CERCLA irrespective of an abandonment by the trustee. The court determined that even if the estate had abandoned the drums before it was discovered that they posed an environmental danger, the estate would still be liable under 42 U.S.C. § 9607(a)(2) of CERCLA, which imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." The court determined that the cost incurred by the EPA in discharging

this liability was an actual, necessary cost of preserving the estate entitled to administrative expense priority. The CERCLA statute provides in the designation section [42 U.S.C. § 9602(a)] that hazardous substances are those which "when released into the environment may present substantial danger to the public health or welfare or the environment ...".

The cases of *In re Thomas Solvent Company*, 44 B.R. 83 (Bankr.Ct.W.D.Mich. 1984), and *In re Laurinburg*, 49 B.R. 652 (Bankr.Ct.M.D.N.C.1984) concerned Chapter 11 debtors in possession. The court in the *In re Thomas Solvent Company* case, *supra*, determined that a Chapter 11 trustee may not preserve its viability as a business entity, yet avoid its responsibility to society, simply by filing a Chapter 11 petition. The court then afforded the debtor an opportunity to file either a liquidating plan or convert the case to Chapter 7 within 90 days or the court would allow the state relief from the automatic stay to enforce its environmental complaint. The court noted that Congress had considered the environmental pollution problems and the distribution of funds to creditors. The *Thomas Solvent* Court stated:

"In Sections 726, 503 and 507 of Title 11, Congress added or extended priority to some classes over § 64 of the 1898 Act, but it did not provide for a priority for environmental claims ..."

The Bankruptcy Court in *In re Laurinburg*, *supra*, allowed the state relief from stay to pursue its complaint to abate a public nuisance against the Chapter 11 debtor in possession. The court held that the state's action sought traditional injunctive relief and not the payment of a money judgment. The court's order further allowed the expenses of the debtor incurred in abating the public nuisance as administrative expenses necessary to preserve the estate.

The Third Circuit in the case of *Southern Ry. Company v. Johnson Bronze Company*, 758 F.2d 137 (3rd Cir.1985) discusses the subrogation right for cleanup of property which violates environmental laws. The court discussed the decisions by the Third Circuit in *Quanta, supra,* and *Penn Terra Ltd., supra,* and the United States Supreme Court case of *Ohio v. Kovacs, supra.* The Court concluded that *Kovacs, supra,* settled the priority question. The relevant facts are as follows. Prior to filing its bankruptcy petition, the debtor had entered into a consent order with the South Carolina Department of Health and Environmental Control for the cleanup of the debtor's environmental violations. Although the case is complicated by the sale of property and unnoticed agreements, the thrust of the decision as it is important here is that the court considered the subrogated claim as a claim of the South Carolina Department of Health and Environmental Control and citing *Kovacs, supra,* determined that the administrative order of the state was a general unsecured claim. The court stated:

"Since those decisions [Quanta and Penn Terra] the Supreme Court has spoken definitively on the priority question in *Ohio v. Kovacs, supra,* and that case controls. The bankruptcy court had no authority to elevate Southern's general unsecured contract indemnity claim to the status of a claim secured by a lien on the proceeds of the sale from Johnson to Perry."

While this Court cannot find this determination in the decision of *Ohio v. Kovacs, supra,* it agrees with the statement.

In the *Matter of Baldwin-United Corp.,* 43 B.R. 443 (D.C. Ohio 1984), the District Court held that the Bankruptcy Court lacked discretion to authorize, as administrative expenses, expenditures concerning debt which matured prepetition but only became due postpetition. The Court noted that the prepetition debtor and the debtor in possession are distinct entities. The District Judge then concluded that an administrative expense determination of a prepetition debt, although matured, is wholly outside the discretion afforded to the Bankruptcy Court through the provisions of § 503. *See, e.g., In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976) ("for a

claim ... to be entitled to first priority ... the debt must arise from a transaction with the debtor in possession").

The Seventh Circuit in the case of *Matter of Chicago, Rock Island and Pacific R. Company*, 756 F.2d 517 (7th Cir.1985), held that the state was not entitled to administrative priority with respect to its claim to be reimbursed for costs for removing certain highway crossings of the debtor to prevent prospective nuisances in the absence of any evidence that removal of the crossings was necessary generally to avert imminent danger.

This Court finds the analysis of the Seventh Circuit useful. The court stated that the State of Iowa was seeking an order to prevent a prospective nuisance, or what amounts to the same thing, an order reimbursing it for the cost of abating a prospective nuisance. The court indicated that Iowa might have a good argument for treating its claim as an administrative expense if the removal of the tracks was necessary to avert an imminent danger. The removal would be like buying a new signal to replace an old one, a transaction that would benefit creditors by protecting the bankrupt estate against tort liability for crossing accidents. But in the case of the removal of the crossings, the danger to the public was so remote that the court could not justify classifying the expense as administrative.

■ The Bankruptcy Code clearly provides that expenses occasioned by the debtor in possession while operating as a debtor in possession are "actual and necessary costs and expenses of preserving the estate" and, therefore, entitled to administrative priority. 11 U.S.C. § 503(b)(1)(A). Similarly any damages caused by a Chapter 7 trustee operating the bankrupt estate are entitled to administrative priority. However, prepetition expenses occasioned by the prebankruptcy debtor are not entitled to administrative priority. Congress specifically categorized prepetition expenses into priorities in 11 U.S.C. § 507. The 1984 amendments expanded the list of priorities, but no category was created for environ-

mental damages and this Court is not empowered with the authority to change the priorities as enacted by Congress.

Congress was aware of the problem such as the one before this Court and recognized the impact that environmental regulations may have on bankruptcies. The Congressional intent to allow enforcement of environmental regulations is clear in 11 U.S.C. § 362(b)(4). But to preclude governmental units from gaining a favored position as creditors while acting under the umbrella of their enforcement powers, Congress also set forth within 11 U.S.C. § 362(b)(5) that money judgments are the exception to the exception and are subject to the automatic stay. The Legislative Report specifically states that § 362(b)(5):

"extends to permit an injunction and the enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would be preferential treatment to the detriment of all other creditors."

Congress extended this prohibition against predatory creditor actions by limiting the section 362(b)(4) exception. H.R. Rep. No. 595, 95th Cong., 1st Sess. 340–343 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News, 5787, 5963, 6299.

■ After reviewing the *Kovacs* case and the *Midlantic* case, this Court concludes that the question of priority status for every environmental clean-up cost has not been answered by the United States Supreme Court. This Court in applying the provisions of 11 U.S.C. § 503(b)(1)(A) to the instant case finds that the cost of reclaiming the area disturbed by Pierce, *as a debtor in possession*, is entitled to administrative priority. The testimony of Rodney W. Clay as to damages was to the effect that the damages were more than the bonded

amounts on each bond. The actual cost of reclamation was not given, but Transamerica has indirectly set the amount of damages by evidence of the bonded amounts. If the actual damages had been proven, the results may have been different, but the Court must rely upon the evidence presented. Transamerica had the burden of proving its claim on the basis of its subrogated rights to the State. The bonded permits were as follows:

| Permit | | |
|---|---|---|
| | 112–79 | $ 80,000 |
| | 36–79 | 107,000 |
| | 94–78 | 27,000 |
| | 100–78 | 47,000 |
| | TOTAL | $261,000 |

The testimony of Michael G. Reese indicated that 10% of the disturbance under permit 112–79 occurred during the bankruptcy. The proven costs of reclamation introduced into evidence were $80,000 (the bond amount) and, therefore, the State would be entitled to 10% of the $80,000 or $8,000 as an administrative expense. Under bond 36–79 and using the same theory (10% of disturbance), the State would be entitled to $10,700 as a claim for administrative expense. The remaining claim of the State is for reclamation for damages which occurred prior to the filing of the bankruptcy petition. (This Court concludes from the evidence that the Chapter 7 trustee did not cause any damages to the environment during his operation of the business. No evidence was adduced of any damages during the May 14, 1982 through June 18, 1982 period, when the trustee was authorized to operate the business.)

Therefore, $242,300 of the claim of Transamerica ($261,000 total bond less the allowable administrative priority claims of $18,700) is a general unsecured claim. These prepetition expenses were not incurred by the debtor in possession, and their priority in relation to other unsecured claims is determined by 11 U.S.C. § 507. This Court agrees with the proposition stated in the *Southern Ry. Co.* case, *supra,* the bankruptcy court has no authority to elevate a prepetition unsecured claim to an administrative priority.

This Court does find an implied exception to the above-stated rule in *Midlantic Nat. Bank v. N.J. Dept. of E.P., supra.* The United States Supreme Court has indicated in its decision that where imminent and identifiable harm is present, the priorities of the Bankruptcy Code may be subservient to the environmental laws designed to protect the public safety. It is reasonable to expect that under a given set of circumstances, the necessary costs of protecting the public health or safety from imminent and identifiable harm may be elevated to administrative priority and, perhaps, even to a type of secured priority. *See, Matter of Chicago, Rock Island and Pacific R. Company, supra.* However, the evidence of such a situation is totally lacking in the instant case.

It is accordingly SO ORDERED.