In the Matter of KENT HOLLAND DIE CASTING & PLATING, INC., Debtor.

In the Matter of HOLLAND DIE CASTING & PLATING, INC., Debtor.

The WINDOLPH TRUST, Plaintiff,

v.

Douglas LEITCH, Trustee of the Debtors' Estate, Defendant.

Bankruptcy Nos. NG 83–03069, NG 83–03070.
Adv. No. 89–0326.

United States Bankruptcy Court, W.D. Michigan.

March 8, 1991.

William J. Barrett, Grand Rapids, Mich., for plaintiff, The Windolph Trust.

Alan C. Schwartz, Grand Rapids, Mich., for defendant, Douglas Leitch, Trustee of the Debtor's Estate.

## OPINION

DAVID E. NIMS, Jr., Bankruptcy Judge.

The Windolph Trust (Windolph) filed an application for payment of administration expense requesting that the court enter an order compelling Douglas Leitch (Leitch), the trustee of the Chapter 7 estates of Kent Holland Die Casting & Plating, Inc. (Kent) and Holland Die Casting & Plating Inc. (Holland), to pay as administration expenses the following claims of Windolph:

1.   Rent from March 1, 1986 forward for the items of the Debtor's personal property stored on the property leased to them by Windolph, in an amount of not less than $25,000.

2.   Cleanup expenses attributable to the dumping of waste on the real property since December 7, 1983, in the amount of not less than $350,000, including $55,034 for costs already incurred.

3.   Cleanup expenses attributable to the removal of contaminated personal property of the Debtor from the property in the amount of not less than $35,000.

Since filing the application, the parties have settled claim #1 (above) for rent.

The parties have also stipulated that all issues concerning the liability of the Debtor's estate for Windolph's claims, as well as the priority of any such claims, shall be decided upon the facts stipulated by the parties. Issues concerning the amount of such claims shall be tried separately after the resolution of the liability and priority issues. All facts agreed upon by stipulation are admitted only for the court's resolution of the liability and priority issues.

## STIPULATED FACTS

Kent and Holland filed Chapter 11 petitions on December 7, 1983. The two cases were administered together and were consolidated through the reorganization plan which was confirmed on September 24, 1984. The plan provided, "The Debtor assumes all executory contracts in existence as of the date of filing of the proceedings herein which have not, and are not, rejected prior to the entry of an Order Confirming Debtor's Plan of Reorganization, or to which no hearing is pending." On July 15, 1986 [1] the cases were converted to Chapter 7.[2]

The Hermarwin Corporation, owned by Herman and Mary Windolph, held title to the property in question from the mid–1950's until June 24, 1983, when, upon the death of Herman, title was conveyed to the Windolph Trust. Windolph assumed the obligations of lessor under the then existing lease. The manufacturing facility, a factory occupying approximately 130,000 square feet, was constructed in the 1950's and was leased to Holland from the time of its construction until December 31, 1977.

On December 8, 1977, Hermarwin and Holland executed a lease agreement for the

---

1.   Judicial notice is being taken of this date as it is not contained with the stipulation.

2.   The court is not determining at this juncture the effect of the conversions on the consolida-

tion of the cases under the plan. For purposes of convenience and clarity, references to Kent and Holland separately or collectively are stated as "Debtor."

property (the "1977 Lease"). Paragraph 5 of the 1977 Lease provided:

> Lessee will keep said building in good repair ... and will maintain said building in a clean and healthy condition, and in accord with all applicable laws and regulations, and the direction of the proper public officials, during the term of this Lease at its own expense and upon the termination of this Lease in any way, will yield up said premises to Lessor in good condition and repair (ordinary wear excepted) and will deliver the keys to Lessor. Such repairs and replacements, interior and exterior, ordinary as well as extraordinary, and structural as well as well as non-structural, shall be made promptly as and when necessary. All repairs and replacements shall be in quality and class at least equal to the original work. On default of the Lessee in making such repairs or replacements, the Lessor may, but shall not be required to, make such repairs and replacements for the Lessee's account, and the expense thereof shall be collectible as additional rent.

The Debtor remained in possession of the property and factory under the 1977 Lease until June 7, 1985, on which date the 1977 Lease was superseded by a new lease agreement. Paragraph 7 of the 1985 Lease provided:

> During the term of this Lease, Lessee, at its own expense, will keep the building in good repair ... and will maintain the building in a clean and healthy condition and in accordance with all applicable laws and regulations and the directives of the proper public officials. Upon the termination of this Lease for any reason, Lessee will yield up said premises to Lessor in good condition and repair (ordinary wear excepted) and will deliver the keys to Lessor. Such repairs and replacements, interior and exterior, ordinary as well as extraordinary, structural as well as nonstructural, shall be made promptly as and when necessary and shall be in quality and class at least equal to the original work. Upon default of the Lessee in making such repairs or replacements, the Lessor may, but shall

not be required to, make such repairs or replacements for the Lessee's account, and the expenses thereof shall be collectible as additional rent.

Under the 1985 Lease the Debtor remained in possession of the property and factory until October 16, 1985. Thereafter, the Debtor continued to occupy a portion of the factory until August 1989 (for the storage of barrels). The Debtor never obtained a fee interest in the property, nor did it at any time reject the 1977 or 1985 Lease.

From 1977 through approximately October 1, 1985, the Debtor used the factory to manufacture and plate die castings. Materials used by the Debtor in its operation included zinc, copper, cyanide, nickel, and chromium. Federal and State environmental authorities list each of these substances as being hazardous. As a result of the Debtor's operation, the factory produced various waste waters which primarily resulted from rinse tanks on the plating line. During all times that the Debtor operated the factory, wastewater was treated on-site through various chemical processes. Following chemical treatment, the wastewater passed through concrete settling tanks, and was then discharge into lagoons. After additional settlement in the lagoons, the water was discharged into a nearby stream prior to 1981 and into the Holland municipal waste treatment system after 1981. As part of the wastewater treatment process, sludges would accumulate in the concrete settling tanks and the lagoons. Proper operation of the wastewater system required that accumulated sludge in the settling tanks and lagoons be removed and hauled to an appropriate long term disposal facility.

Because of the Debtor's failure to remove sludge that had accumulated in the concrete settling tanks and lagoon, wastewater overflowed from the tanks and lagoons and spilled across a portion of the property. Waste generated by the Debtor remains on the property and in the factory, including in the concrete settling tanks and lagoons. From December 7, 1983, until about October 1, 1985, the Debtor operated

the factory as Debtor in Possession and generated additional wastewater. No additional waste was discharged onto the property after conversion of the cases to Chapter 7 and the Chapter 7 Trustee has not operated any property of the Debtor's estate located at the property or in the factory so as to cause any further generation of any hazardous substances.

At a show cause hearing on November 3, 1986, the court approved the Chapter 7 Trustee's sale to James Langan of machinery and equipment that had been in the factory. The purchaser (through counsel) represented at the hearing that he would clean up any damage resulting from the removal of equipment.

On February 24, 1984, the Debtor received notice from the United States Environmental Protection Agency (E.P.A.) that the property had been contaminated with hazardous substances as a result of the Debtor's operations. The E.P.A. commenced administrative action against the Debtor to require identification of wastes stored in barrels on the property, groundwater monitoring, closure of the waste treatment facility, and to assess fines and penalties.

Negotiations between the Debtor and the E.P.A. thereafter began but did not result in any agreement before the Debtor ceased operations. Upon cessation of its operation on October 1, 1985 (and prior to conversion of this Case to Chapter 7), the Debtor left in the factory approximately 120 fifty-five gallon drums containing a variety of hazardous substances. The E.P.A. determined that the barrels created an imminent and substantial endangerment and required that Windolph conduct tests to determine the chemical composition of the material in the barrels and to dispose of the drums at an appropriate facility.

On February 14, 1986, Windolph received notice from Michigan Department of Natural Resources that the property had been contaminated with hazardous substances. The D.N.R. specifically stated that it found contamination in the following areas:

(a) The settling tanks and lagoons into which wastewater was discharged; and

(b) Pits inside the factory.

The D.N.R. also identified various barrels in the factory left behind by the Debtor as possibly containing hazardous waste. Windolph, at its sole expense, completed the steps required by the E.P.A. to dispose of the drums in late October, 1989, at a cost in excess of $50,000.

On February 17, 1988, the E.P.A. sued Windolph to compel cleanup of all identified hazardous substances on the property and in the factory. The State of Michigan has intervened as a plaintiff in the lawsuit. That lawsuit is presently in the discovery phase. The E.P.A. never moved for relief from stay or commenced any action against Debtor or the Chapter 7 Trustee in this bankruptcy proceeding with respect to its administrative action. Neither the E.P.A. nor the Michigan Department of Natural Resources has filed a proof of claim against the Debtor's estate based on contamination to the property or factory.

The Chapter 7 Trustee had not at any time abandoned the barrels, which represented absolutely no value to the Debtor's estate, and neither the Trustee nor the Debtor in Possession entered into any agreement with Windolph regarding the storage or removal of the barrels. The Chapter 7 Trustee has not taken any action to date to remedy the existing contamination at the property, or contributed funds for such purposes. The cost to clean up the hazardous waste contamination on the property and in the factory will be in excess of $600,000.

A portion of the contamination to the factory and premises:

—may be the result of operation prior to December, 1977;

—may be the result of operations in the factory conducted by the Debtor after December, 1977 but prior to the Chapter 11 filing;

—may be the result of operations in the factory conducted by the Debtor during the period when it operated as Debtor in Possession;

—and may be the result of waste that leaked from the concrete settling ponds,

lagoons, and pits inside the factory after the conversion of the Debtor's bankruptcy cases to Chapter 7, or may be the result of non-contaminated materials falling into the pits holding waste as a result of the removal of equipment from the factory.

## DISCUSSION

■■■ 11 U.S.C. § 503(b)(1)(A) provides, "After notice and a hearing, there shall be allowed administrative expenses, ... including the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." Administration expense status is very important because, upon distribution, these claims have a first class priority over all other unsecured claims. 11 U.S.C. § 507(a)(1). Where there has been a conversion to Chapter 7, expenses of administration in the Chapter 7 case take priority over those in the Chapter 11 case. 11 U.S.C. § 726(b). This court would agree that "Priority statutes, such as § 503, are to be strictly construed. (cites omitted) The applicant must prove by a preponderance of the evidence entitlement to the administrative expense." *In re Grimm & Rothwell, Inc.*, 108 B.R. 186, 189 (Bankr.S.D.Ohio 1989).

Windolph's claim for administrative expense is based on three arguments: federal environmental laws, contractual and common law obligations not to commit waste, and negligence.

### 1. Federal Environmental Laws

■ Pub.L. 96–510, Dec. 11, 1980, 94 Stat. 2767, Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq. (CERCLA) includes the following:

42 U.S.C. § 9607(a)

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such release;

42 U.S.C. § 9613(f)(1) provides, "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." Under 42 U.S.C. § 9607(a) the Debtor was the "operator" of the polluted facilities and Windolph was the "owner." Pursuant to § 9613(f)(1) Windolph may seek contribution from the Debtor. However, the difficulty which arises is the application of CERCLA in a bankruptcy context.

One of the first such cases to reach the Supreme Court was *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). The Supreme Court affirmed the lower court's decision, stating:

We do not disturb this judgment. The injunction surely obliged Kovacs to clean up the site. But when he failed to do so, rather than prosecute Kovacs under the evironmental laws or bring civil or criminal contempt proceedings, the State secured the appointment of a receiver, who was ordered to take possession of all of Kovacs' nonexempt assets as well as the assets of the corporate defendants and to comply with the injunction entered against Kovacs. As wise as this course may have been, it dispossessed Kovacs, removed his authority over the site, and divested him of assets that might have

been used by him to clean up the property.

*Id.* at 282, 105 S.Ct. at 709. Although the Court held that the debtor's obligation to clean up the hazardous waste was a debt which was dischargeable, it was careful to limit its decision.

> It is well to emphasize what we have not decided. First, we do not suggest that Kovacs' discharge will shield him from prosecution for having violated the environmental laws of Ohio or for criminal contempt for not performing his obligations under the injunction prior to bankruptcy. Second, had a fine or monetary penalty for violation of state law been imposed on Kovacs prior to bankruptcy, § 523(a)(7) forecloses any suggestion that his obligation to pay the fine or penalty would be discharged in bankruptcy. Third, we do not address what the legal consequences would have been had Kovacs taken bankruptcy before a receiver had been appointed and a trustee had been designated with the usual duties of a bankruptcy trustee. Fourth, we do not hold that the injunction against bringing further toxic wastes on the premises or against any conduct that will contribute to the pollution of the site or the State's waters is dischargeable in bankruptcy; we here address, as did the Court of Appeals, only the affirmative duty to clean up the site and the duty to pay money to that end. Finally, we do not question that anyone in possession of the site—whether it is Kovacs or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or the bankruptcy trustee—must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions. As the case comes to us, however, Kovacs had been dispossessed and the State seeks to enforce his cleanup obligation by a money judgment.

*Id.* at 284, 105 S.Ct. at 710–11.[3]

A year later, the Court handed down its famous decision of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), *reh'g denied*, 475 U.S. 1090, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986). Quanta Resources Corporation processed waste oil at two facilities. As the New Jersey and New York authorities were closing in, Quanta filed under Chapter 11 and shortly thereafter converted to Chapter 7. The Court disallowed the Chapter 7 trustee's attempt to abandon both facilities.

> Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.

*Id.* 474 U.S. at 507, 106 S.Ct. at 762.

In *In re Peerless Plating Co.*, 70 B.R. 943 (Bankr.W.D.Mich.1987), this court held that the EPA's claim for cleanup costs, even if it arose prior to the debtor/owner's Chapter 7 filing, was not avoidable by abandonment pursuant to the test found in *Midlantic*, and thus "the Trustee had a duty to expend all the unencumbered assets of the estate in remedying the situation." *Id.* at 948. Therefore, the EPA claim was given administrative expense priority. In the case at bar, however, the Debtor never owned the premises on which it did business, but rather leased its premises. The Sixth Circuit rendered its opinion in *Lancaster v. Tennessee (In re Wall Tube & Metal Products Co.)*, 831 F.2d 118 (6th Cir.1987) later in the same year as *Peerless* in which it dealt with a debtor/lessee.

---

**3.** In *U.S. v. Whizco, Inc.*, 841 F.2d 147 (6th Cir.1988), in an action against an individual debtor by the Secretary of the Interior to enforce the reclaiming of an abandoned mine, the sixth circuit closely followed *Ohio v. Kovacs* and held that this in effect was a debt, since it would require funds to be spent, and the debt was discharged in bankruptcy.

In *Wall Tube* the debtor manufactured metal fabrications on a site to which it had a twenty year lease. The debtor halted operations in October, 1983, and subsequently a state inspector issued a notice of violation of the state environmental law and recommended immediate, proper disposal. On February 22, 1984, the debtor filed a Chapter 7 petition. Dumping or spilling of various wastes was found on the ground, inside the buildings, in drums inside and outside the buildings, and in tanks, vats and bottles. The Chapter 7 trustee gave notice pursuant to Bankruptcy Rule 6007 of his intent to convey most of the property to its original lessors, and the bankruptcy court approved the conveyance. The costs for which the State sought administrative expense priority were those incurred in connection with the items that remained in the debtor's estate, drums and tanks containing hazardous waste.

The court allowed the State's claim as an administrative expense, reversing the lower courts and stating:

It follows that if the Wall Tube trustee could not have abandoned the estate in contravention of the State's environmental law, neither then should he have *maintained or possessed* the estate in continuous violation of that same law.
. . . .

The *Midlantic* Court found that Section 959(b) *supported* its conclusion that the Bankruptcy Code does "not pre-empt all state laws that otherwise constrain the excuse [sic] of a trustee's powers." *Midlantic,* 474 U.S. at 505, 106 S.Ct. at 762. Furthermore, the Court noted Congress' intentions that the trustee's efforts "to marshal and distribute the assets of the estate" give way to the governmental interest in public health and safety. *Id.* at 502, 106 S.Ct. at 760. We believe that whether a trustee is liquidating, managing or reorganizing the debtor's estate, his efforts under the Code remain the same—the consolidation and distribution of the estate's assets to the benefit of the creditors. As such, that the trustee in this case is liquidating the estate rather than reorganizing it is inconsequential, especially in the critical context of

the public's welfare. In either case, an environmental hazard *on the estate's property* is within the control of the trustee. (emphasis added).

In a case decided before *Midlantic, Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Court stated that it did "not question that *anyone in possession of the site*—whether it is [the debtor] or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or the bankruptcy trustee— *must comply with the environmental laws of the State."*

*Id.* at 122.

CERCLA's unquestionably desirable "primary purpose is the prompt cleanup of hazardous waste sites." *J.V. Peters & Co., Inc. v. Administrator, EPA,* 767 F.2d 263, 264 (6th Cir.1985) citing *Walls v. Waste Resource Corp.,* 761 F.2d 311, 318 (6th Cir.1985). We think it proper that the response costs incurred by Tennessee and recoverable under CERCLA be deemed an administrative expense.

*Id.* at 123.

Two circuits have denied claims administrative expense status for contamination of property not owned by the debtor's estate which occurred prepetition. *Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700 (9th Cir.1988), and *Southern Railway Co. v. Johnson Bronze Co. (In re Johnson Bronze Co.),* 758 F.2d 137 (3rd Cir.1985). While realizing that these cases are not binding on this court, it is also noteworthy that these cases are not factually parallel to *Wall Tube.* The ninth circuit even stated:

Quite a different result, however, is warranted when the cleanup costs result from monies expended for the preservation of the bankruptcy estate. *See, eg., Lancaster v. Tennessee (In re Wall Tube & Metal Prod. Co.,* 831 F.2d 118, 124 (6th Cir.1987)) (state entitled to administrative expense priority for its response costs from the debtor's estate under CERCLA);

*Dant & Russell,* 853 F.2d at 709. *See also In re Pierce Coal and Construction, Inc.,* 65 B.R. 521 (Bankr.W.Va.1986) (administrative priority allowed for damages which occurred during operations of the debtor in possession and of the trustee in the Chapter 7 case but not allowed for damages caused prepetition).

■■■ Clearly, the barrels left on the property but never abandoned by the Trustee, on which Windolph spent over $50,000. in disposal costs, were property of the estate. Since these barrels could not have been abandoned pursuant to *Midlantic,* Windolph is entitled to a Chapter 7 administrative expense claim for their disposal as was the State in *Wall Tube.* The Trustee argues in his brief that *Wall Tube* should not be applied in this situation because here Windolph is trying to collect versus a government body. However, section 9607(a)(2)(A), which allows for governmental recovery of its costs, is not given any more validity in bankruptcy than section 9607(a)(2)(B), which allows for other persons to recover their costs. The barrels were property of the estate, and therefore the Debtor is responsible for their disposal.

■■■ Allowance of Windolph's claim for cleanup of the leased property based on CERCLA also depends on whether the site would be considered property of the estate. The stipulated facts do not show that there was a proceeding under Bankruptcy Rule 6007 as in *Wall Tube.* Although this is an interesting question in the setting of a confirmed Chapter 11 plan under which a lease was assumed but which later converted to Chapter 7, and one which *In re Vermont Real Estate Investment Trust,* 25 B.R. 804 (Bankr.D.Vt.1982), referred to in *Wall Tube,* may shed some light, this analysis need not reach that point because of the Trustee's argument that the claim is contingent and for contribution.[4]

11 U.S.C. § 502(e)(1)(B) provides:

(e)(1) ... the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor

on, or has secured, the claim of a creditor, to the extent that—

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution; ...

In *Syntex v. Charter Co. (In re Charter Co.),* 862 F.2d 1500 (11th Cir.1989), approximately 500 plaintiffs, along with the United States and the State of Missouri, in eight lawsuits claimed three billion dollars in damages partially pursuant to CERCLA. Four Chapter 11 debtors were named as defendants in some of the lawsuits, the allegations being that the debtors had arranged for the transportation of waste. The other defendants filed proofs of claim seeking contribution, reimbursement or indemnity. The bankruptcy court disallowed the claims. The district court affirmed and the court of appeals, finding the claims entirely dependant upon the outcome of pending state court litigation, also affirmed.

A suit based on environmental laws brought by the E.P.A. against Windolph, and in which the State of Michigan has intervened as a party plaintiff, is pending. The claim based on those environmental laws, other than for removal of the barrels, is contingent at this time. Since at the time of its allowance or disallowance the claim is contingent, the court disallows Windolph's claim for contribution. However, even though using CERCLA may seem the most appealing approach as it eliminates the necessity of proving negligence by imposing strict liability, the analysis does not end here. We must continue to the other two arguments Windolph advances in support of administrative priority.

### 2. *Contract*

Both the 1977 Lease which was assumed under the confirmed Chapter 11 plan and the 1985 Lease contained provisions that required the Debtor to maintain the premises in a clean and healthy condition and in

---

**4.** This argument is not applicable to the cleanup of the barrels as that is not a contingent claim

since Windolph has already expended the money.

accordance with all applicable laws and regulations. The Debtor violated those lease provisions. Windolph asserts that the postpetition violation entitles it to an administrative expense for the cost of cleanup. The Trustee's position is that to allow the damage claim of Windolph would be contrary to the holding in *Employee Transfer Corporation v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir. 1987).

In that case, Employee Transfer Corporation (ETC) by contract with White Motor Corporation (WMC), the debtor, would purchase homes of WMC employees with all direct costs to be paid by WMC upon resale. On July 28, 1980, the contract expired but the parties continued to transact business. On September 4, 1980, WMC filed a Chapter 11 petition. ETC filed a motion to have the expenses it incurred after the filing date in connection with houses it purchased from WMC between July 28, 1980 and September 4, 1980, paid as an administrative expense. The bankruptcy court held that the expenses were not entitled to be an administrative priority. The district court and court of appeals affirmed. The Trustee's brief cites *White Motor,* quoting *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976), for the test for whether a claim is entitled to administrative expense treatment. "[A] claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate." *White Motor,* 831 F.2d at 110. The Sixth Circuit in *White Motor* was concerned with the first prong of the test, and held that if the creditor was induced to perform by the prepetition debtor, the creditor's claim arose prepetition and thus is not entitled to priority. Here, the Trustee states that the first prong of the test has been satisfied but takes issue in regard to the second, direct and substantial benefit to the estate. The second prong is the issue looked at in *United Trucking Service, Inc. v. Trailer Rental Company, Inc. (In re*

*United Trucking Service, Inc.),* 851 F.2d 159 (6th Cir.1988).

In *United Trucking* TRC, who leased trailers to the debtor, filed application for administrative expense for the cost of repairs, etc. incurred as a result of the debtor's use of the trailers postpetition. The debtor never assumed the prepetition lease which required the lessee to maintain the trailers in good condition and make repairs at its own expense, and by the time the debtor turned over the trailers, they were in need of substantial repair. The court, after differentiating this case from *White Motor* as there was no question of inducement with TRC, found that the debtor's breach and misuse of the trailers benefitted the estate since the money not spent on repairs enabled the debtor to continue its operation. The priority given to TRC under § 503 was explained in light of *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.,* 280 F.2d 119 (2d Cir.1960) as the court quoted from that opinion:

> The right to priority in the event the trustee or debtor in possession receives benefits under the [executory] contract during the interval between the filing of the debtor's petition and the rejection of the contract "is an equitable right based upon the reasonable value" of the benefits conferred, rather than upon the contract price.
>
> . . . .
>
> ... [T]he purpose of according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him.

*Id.* at 162.

The Trustee argues that *United Trucking,* applying the equitable principle of unjust enrichment to determine the damages, is inapposite to this case in which the Debtor had a postpetition agreement with Windolph. It is true that equitable principles should not be applied in this situation while the Debtor was in Chapter 11. The sentences from *American Anthracite* directly preceding those quoted by *United*

*Trucking* explain and contrast what happens in the case of an assumed contract:

The claim of a creditor having an executory contract with the debtor at the time the debtor's petition is filed is entitled to priority under these provisions only if the trustee or debtor in possession elects to assume the contract or if he receives benefits under it. The right to priority in the event the contract is assumed follows from the fact that the trustee or debtor in possession has elected to make the contract of the debtor his own, just as if it had been made by the trustee or debtor in possession in the first instance.

*American Anthracite,* 280 F.2d at 124. When the Debtor assumes a contract, in this case the lease, the damages which arise from breaching the terms of that contract postpetition are "actual, necessary costs and expenses of preserving the estate" because the liabilities of the Debtor which arise under that contract are necessarily incurred so that he might receive the benefits of the contract. Therefore, based on the postpetition violations of the leases, Windolph has a Chapter 11 administrative priority for the cleanup of waste generated during the Chapter 11.

Any cleanup costs resulting from breach of the lease terms during the Chapter 7 and before the property was turned over to Windolph would be entitled to a Chapter 7 priority, but the administrative expense would be limited to the "actual value conferred on the bankruptcy estate by reason of wrongful acts or breach of agreement." *United Trucking,* 851 F.2d at 162. The stipulation suggests contamination arose postconversion either by leakage or materials falling into waste pits during the removal of equipment. Limiting damages to value conferred on the estate, the very most Windolph would be entitled to as an administrative Chapter 7 priority for breach of contract would be the rental value, and the issue of rent has previously been settled between the parties. Leaking, a passive breach of the lease, would not confer a benefit upon the estate, nor would materials falling into waste pits during removal of equipment.

There is no priority for a landlord's prepetition claims against a tenant because of a breach of contract or lease. As the plant out of which the Debtor operated was originally built and owned by Windolph or its predecessors and was occupied by the Debtor from its completion to the date of the filing of the petition, Windolph has an unsecured, nonpriority claim for damages caused by debtor during that period.

See also *Shapiro v. D.H. Overmyer Co., Inc. (Texas) (In re D.H. Overmyer Co., Inc. (Texas)),* 12 B.R. 777 (Bankr.S.D.N.Y. 1981), *aff'd,* 30 B.R. 823 (S.D.N.Y.1983); *H.T. Poindexter & Sons Merchandising Co. v. Small (In re Transport Clearings–Midwest, Inc.),* 41 B.R. 528 (Bankr.W.D. Mo.1984); *International Coins & Currency, Inc. v. Barmar Corporation (In re International Coins & Currency, Inc.),* 18 B.R. 335 (Bankr.D.Vt.1982).

### 3. Negligence

In *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), the Court held that damages resulting from a receiver's negligence were "actual and necessary costs" and thus entitled to administrative expense priority in a Chapter XI arrangement. Although *Reading* is a case under the Bankruptcy Act of 1898, I find no material differences between 11 U.S.C. § 503(b)(1) and Bankruptcy Act § 64(a). Knight Realty Corporation filed a petition under Chapter XI and Brown was appointed receiver with powers to operate. A month and a half later, a fire destroyed debtor's buildings and destroyed real and personal property of the Reading Company and others. Reading filed its claim for administrative expense April 3, 1963, and on May 14, 1963, Knight was voluntarily adjudicated a bankrupt and the receiver was elected trustee. The trustee moved to expunge Reading's claim, arguing this was not an expense of administration. The referee in bankruptcy disallowed the claim as an administration claim and also as a general unsecured claim. The district court upheld the referee's decision, which was in

turn upheld by the Third Circuit Court of Appeals. The Supreme Court, after looking to the general purposes of § 64(a), the Bankruptcy Act as a whole, and the fairness to all claimants, reversed and remanded.

The *Reading* case has been relied upon by numerous courts since then, including the first circuit in *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry Inc.)*, 755 F.2d 200 (1st Cir.1985). Having continued to operate in violation of an injunction issued against it, the debtor filed Chapter 11 shortly before its trial date. After a lift of stay, the state court ordered the debtor to pay the plaintiff a compensatory fine based on legal services and disbursements. The plaintiff sought an administrative expense priority for the portion of the services and disbursements incurred postpetition. Although the lack of benefit to the estate was the basis for the bankruptcy court's denial of priority, the circuit court, referring to *Reading*, reversed saying, "If fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, then, a fortiori, an intentional act which violates the law and damages others should be so treated." *Id.* at 203.

■■■■ The Trustee has admitted in the agreed statement of facts that the Debtor failed to remove sludge that accumulated, causing waste water to overflow and spill across a portion of the leased property. The Debtor also left some 120 fifty-five gallon drums containing hazardous material. The court would find that these actions were negligent and the damages to the property and Windolph give rise to a Chapter 11 administrative expense priority. The cause and extent of waste during the Chapter 7 is unclear from the stipulation of facts. If the court later finds negligence by the Chapter 7 Trustee, the cleanup costs from the resulting waste would be a Chapter 7 administrative expense priority. As the determination of the amount of the damages has been held in abeyance under the agreement to bifurcate, the court must also later determine what damages are attributable to any negligence on behalf of Windolph.

## CONCLUSION

1. Chapter 7 administrative expense priority is given to Windolph for costs incurred in disposing of the barrels (based on CERCLA), and in cleanup of any waste resulting from any negligence on the part of the Chapter 7 Trustee.

2. Chapter 11 administrative expense priority for cleanup of waste committed during the Chapter 11 is awarded based on breach of contract and negligence by the Debtor in Possession.

3. The Debtor is liable to Windolph for all damages caused by its operation prior to the filing of the Chapter 11 petition. This will be allowed as a general unsecured claim only.

## THOUGHTS ON PROOFS OF DAMAGES

1. Proof of damages will not be easy.

2. If it appears to the parties that there will be nothing for non-priority unsecured creditors, it may not be necessary to do more than establish the degree of pollution as of the date of filing.

3. It may be necessary to obtain the help of expert witnesses, chemists, specialists in the field of environmental pollution, and those who have become experts in the methods and cost of cleaning up the environment.

4. Although early Michigan cases have placed a severe burden on tenants, it occurs to the court that in recent years, rentals to those engaged in operations that are likely to cause environmental problems may charge a much higher rent to offset this damage. If this is true, should the owner or lessor assume some of the responsibility for a more rigid control over the use of the premises and the cost of cleanup?

As soon as the parties have digested this opinion they should confer and determine how they desire to proceed with the matter of damages and should notify the court as to their decision. If the court hears noth-

ing within thirty days of the date of this decision, a date for pretrial will be set and notice sent to counsel.